JUSTICE SOLOMON delivered the opinion of the Court.
**502 I. Introduction
One week after defendants' murder trial began, after counsel made opening statements and examined four of the State's witnesses, the prosecutor turned over to defense counsel nineteen reports that were in the State's possession but had *80 not previously been provided to defendants. Defendants then moved to dismiss the indictment with prejudice, relying on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The trial court did not resolve the dismissal motion, and the case continued.
During the ensuing days of trial, the court made several significant evidentiary rulings. One ruling reversed the pretrial holding of another judge by admitting the murder victim's dying declaration heard by the victim's wife. Another ruling excluded as unreliable a police officer's affidavit used in four separate search warrant applications. The excluded affidavit was offered by defendants as evidence to impeach the victim's wife and was relevant to a defense of third-party guilt. At the conclusion of the trial, a jury convicted defendants of murder.
**503 We are called upon, initially, to determine whether the State's failure to produce nineteen discovery items until one week after the trial began violated defendants' due process rights under Brady v. Maryland. If we conclude that the State's failure to produce timely the discovery items violated defendants' due process rights, we must then decide whether the violation warrants dismissal of the indictment or, alternatively, reversal of their convictions and a new trial.
We first conclude that the State's failure to produce nineteen discovery items until one week after the beginning of defendants' murder trial did violate defendants' due process rights under Brady. We reach this conclusion, in part, because the trial court abused its discretion by excluding admissible impeachment and exculpatory evidence withheld by the State. Though there is no evidence or allegation that the State acted in bad faith or intentionally in failing to timely produce the discoverable material, we nonetheless reverse the judgment of the Appellate Division, vacate defendants' convictions, and remand for a new trial because defendants were deprived of a fair trial.
II. Facts & Procedural History
A. The Murder of Tracy Crews & the Initial Investigation
Our discussion of the facts and procedural history is derived from the trial record, which reveals that on a September night in 2008, Tracy Crews was shot three times while on the first floor of the Trenton home he shared with his wife, Sheena Robinson-Crews, and their daughter. After being shot, Crews exited the front door of the home and collapsed in the street.
Meanwhile, Robinson-Crews was sitting in her car nearby speaking with a friend on her cell phone when she heard gunshots and observed a person "half naked [ ] standing in front of [her] home." The person stumbled and, as he came into the light from a nearby liquor store and bar, Robinson-Crews recognized the person as her husband and went to his aid.
**504 At the same time, William Rodriguez-Rivera left the liquor store and bar, after having consumed several beers and whiskies, and heard the screen door of Crews's home slam. Rodriguez-Rivera turned to see Crews "running around and all bloodied and stuff." Crews fell in the street as Rodriguez-Rivera reached him, and from about eighteen inches away, Rodriguez-Rivera asked Crews what happened but received no audible response.
After exiting her vehicle, Robinson-Crews approached and cradled her husband as Rodriguez-Rivera stepped away to call 9-1-1. Robinson-Crews asked Crews repeatedly, "Who did this to you?" Robinson-Crews claims that her dying husband then made a statement that incriminated *81 defendants, William Brown and Nigil Dawson.
Crews was conscious but unresponsive when officers from the Trenton Police Department arrived on the scene. Robinson-Crews told the officers that her husband was shot in their home and that her toddler was still inside.
Officer Maurice Crosby looked through the front door of the home and saw a large amount of blood. Officer Crosby, along with other officers who arrived on scene, went through the house next door, exited into the rear yard, and observed fresh footprints in the mud leading from the victim's house to the fence enclosing the rear yard. The officers entered the victim's home through the open rear door and, while in the kitchen, saw "one or two shell casings laying on the floor," "some blood to the left where the doorway led to the rest of the apartment," and a trail of blood leading from the kitchen to the front door. Officer Crosby located the child, took her outside, and turned her over to another officer as additional Trenton Police officers arrived to help search for the shooter.
The officers examined the area around the victim's home. In a nearby construction yard, they saw freshly disturbed gravel and footprints, which they preserved. Officers located a cell phone, a non-matching charger, and a ski mask on the ground in the passageway between two houses on a nearby street. On the roof of **505 a neighboring garage, another officer recovered a 9-millimeter handgun that matched the shell casings from the victim's home. Police also recovered surveillance video from the liquor store and bar and a nearby home.
An ambulance took Crews to the hospital, where he died as a result of his gunshot wounds. Meanwhile, Robinson-Crews stayed at the scene and made a number of cell-phone calls including several calls to Crews's mother, Barbara Portis. Robinson-Crews told Portis that Crews had been shot and that Portis would "have to bury another son."
While still at the crime scene, Robinson-Crews also made two phone calls within earshot of Detective Nathan Bolognini, one of the investigating officers. A surveillance video showed Detective Bolognini standing close to Robinson-Crews on the night of the murder as she made the calls. Detective Bolognini reported what he overheard to Detective Matthew Norton, who swore to the following in an affidavit (the Norton Affidavit) used in four separate search warrant applications:
Trenton Police Detective Bolognini was with Robinson-Crews after the shooting. During the time that Bolognini was approximately [five] feet from Robinson-Crews and heard her make several telephone calls using her cellular [ ] telephone. The first call Bolognini heard her make appeared to be to who[m]ever shot the victim. Bolognini heard Mrs. Robinson-Crews tell the person on the telephone, "You didn't have to shoot him. You got what you came for, you did not need to shoot him." During this telephone call, Mrs. Robinson-Crews was speaking in a loud voice and seemed frantic. After ending that call, Mrs. Robinson-Crews called another person and told that person, "Those boys did not have to shoot him. They got what they came for, they didn't have to shoot my baby." During this conversation, Robinson-Crews was crying and upset to the point that she had to end the conversation.
[ (emphases added).]
Cell-phone records later revealed that neither of these calls were made to defendants' known cell phones.
At some point during the night, Robinson-Crews called Portis and told her that *82 Crews said "Paperboy and Youngin" had shot him. Robinson-Crews identified "Youngin" as defendant Nigil Dawson (Dawson or Youngin), and stated that her husband knew **506 him through defendant William Brown, who was also known as Paperboy (Brown or Paperboy).
Robinson-Crews refused to speak to the police for approximately six hours after the murder but finally went to the police station and made a statement. In that statement, Robinson-Crews claimed that Crews asked her to go to the liquor store to purchase apple juice for their daughter. Robinson-Crews alleged that when she returned to the house the front door was unlocked and she heard a struggle inside. She then heard four or five gunshots, after which two African-American males dressed in black ran out the back door. Robinson-Crews also told police, "As Tracy was choking on his own blood, he told me that Paperboy and Youngin did this to him." Because police had access to the liquor store's surveillance camera, they knew that Robinson-Crews had not reentered the home before Crews was shot. That same morning, Robinson-Crews went to Portis's home, where she again claimed to Portis that Crews told her, as he was dying, that Paperboy and Youngin shot him.
The next day, Robinson-Crews returned to the police station and gave a second conflicting statement, in which she again maintained that she reentered the home before Crews was shot. She also repeated that, as she held Crews, he stated, "Paperboy" killed him and "Paperboy and Youngin" killed him, and that he told her, "I love you and my daughter, take care of my baby."
A forensic scientist with the New Jersey State Police DNA Laboratory examined the ski mask found on the ground between two houses. The scientist determined that, although not a match, Brown could not be excluded as a contributor to DNA samples taken from the ski mask. The case went cold after the initial investigation. In November 2008, about two months after Crews's death, Robinson-Crews filed a false police report against Brown accusing him of pointing a gun at her.
B. Reopening the Investigation & Indictment of Defendants
Approximately three years passed before Trenton Police reopened the case. Detective Gary Britton became the lead investigator **507 [1] and interviewed Portis. During the interview, Detective Britton asked Portis if she could identify a photograph derived from a frame of the nearby neighbor's surveillance video. Portis identified the person in the photograph as Dawson because she believed that person stood "the same way [Dawson] was standing in [her son's] wedding pictures."
Detective Britton then interviewed Robinson-Crews at Muncy State Correctional Institution in Pennsylvania where she was incarcerated for drug-related offenses. Robinson-Crews admitted that her husband "only uttered Paperboy" in his dying declaration and that she "added on Youngin because [she] knew they did a lot of involvement with each other on things."
On June 6, 2011, defendants were charged with Crews's murder. After their arrest, they were incarcerated at the Mercer County Correctional Center. In May 2012, a Mercer County grand jury returned an indictment charging Brown and Dawson with first-degree murder, N.J.S.A. 2C:11-3(a)(2) and N.J.S.A. 2C:2-6 (count *83 one); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) and N.J.S.A. 2C:2-6 (count two); first-degree robbery, N.J.S.A. 2C:15-1 and N.J.S.A. 2C:2-6 (count three); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(b) and N.J.S.A. 2C:2-6 (count four).
In the summer of 2012, Isaiah Franklin and Terrell Black were in the Mercer County Correctional Center where they met and spoke to Brown and Dawson. Franklin had been charged in five armed robberies, and Black in two armed robberies. According to Franklin and Black, Brown and Dawson made admissions to them regarding Crews's murder. After notifying prosecutors of defendants' admissions, Franklin and Black arrived at favorable plea agreements in exchange for their testimony against Brown and Dawson.
**508 In May 2013, Detective Britton received a letter from the Pennsylvania Department of Corrections representing that Robinson-Crews admitted to inmates at the Muncy Correctional Institution that she had conspired to kill her husband (the Muncy Report). The prison's Internal Affairs Department generated the Muncy Report, which disclosed that "Inmate Cappelli said Inmate Robinson said she had given the keys to ... her and her husband's house to the killers and provided the killers with an approximate time." After the investigation, Detective Britton decided that Marie Cappelli, the only inmate interviewed by Detective Britton whose name was recorded, was not credible. Detective Britton made no notes, recordings, or reports of his interview with Cappelli. Cappelli did not receive any benefit for providing the information.
C. Pretrial Motions & Rulings
Pretrial motions were heard in 2014. The motion judge conducted an N.J.R.E. 104 hearing to resolve several pretrial evidentiary issues, including whether Crews's alleged statement that Brown and Dawson shot him was admissible under N.J.R.E. 804(b)(2) as a dying declaration. At the hearing, the judge concluded that Robinson-Crews was not credible and made the following findings:
[H]er statements, by her own admission, were lies. The statements she gave the police in the two days following the murder of her husband she freely admitted were lies. She was motivated, for whatever reason, to believe that both defendants were the ones who shot and killed her husband. Therefore, she tailored her testimony to tell the police that these defendants were the ones who killed her husband, and made things up where she was not in a position to see her husband being shot and killed, or shot inside the home, because she was outside in her automobile.
....
Therefore, the Court finds overall she's not a credible witness, and clearly, the State has not proved by clear and convincing evidence that through this single witness, Sheena Robinson-Crews, that, in fact, the defendants, in particular, Mr. Brown, had a motive to shoot and kill the deceased.
At the same hearing, the motion judge excluded Crews's dying declaration, stating:
[T]he late Mr. Crews may very well have known he was dying, and in fact, he was apparently choking on his own blood, the case law indicates the admissibility of **509 such statements will depend [on] the totality of the relevant circumstances surrounding the articulation of the dying declaration.
So the Court has to take into consideration the Court's finding that Sheena Robinson-Crews is not a credible witness. She admitted repeatedly on the *84 witness stand before me she either lied or when she was confronted with a prior statement, she said I don't recall. Therefore, I don't find she's a credible witness. So I can't give any -- very little, if any, credibility to her statement as to what she repeated allegedly made by her late husband.
In reaching that conclusion, the motion judge also cited the testimony of Rodriguez-Rivera:
And obviously, I now have a statement from an eye witness who is apparently independent, William Rodriguez[-]Rivera, who when he was interviewed on February 11th, 2009, some five or so months after the incident, he said he was present when Sheena Robinson-Crews asked the man, "Baby, who did this?" over and over. He, the deceased, couldn't talk to answer her. He couldn't say anything. So that seems to confirm from the independent witness that perhaps the dying victim never even said the word Paperboy.
Thus, the defense prepared for a trial that would not include Crews's dying declaration.
D. Defendants' Trial; Disclosure of Withheld Evidence
The trial began in mid-January 2015, more than six years after Crews's murder, before a judge who was new to the case. One week after the trial started, after counsel made opening statements and examined four of the investigating Trenton police officers called as State witnesses, the prosecutor turned over eighteen reports not previously given to defense counsel that "were in a file that was actually in [the State's] office in homicide." The reports concerned facts discussed in the testimony of the investigating officers who had already testified. For example, the records turned over included a report by Detective Terman that contained information about a canine search on the night of the murder that tracked footprints in many directions, not just the one path the State believed, and which the officers testified to at trial, the shooters had followed. Defense counsel argued that the evidence contradicted the witnesses' testimony, stating:
Judge, this thing about the dogs that were called out, they lead the officers in a completely different direction and they are all going in different places and we would have opened on that.... There are so many inconsistencies. And, in fact, **510 [another police officer] and Officer Crosby, their testimony is, essentially, in some respects contradicted by the reports we now have.[2]
The records also included the Norton Affidavit detailing statements made by Robinson-Crews on her cell phone the night of Crews's murder that Detective Bolognini overheard. Defense counsel obtained the cell-phone records of defendants, which showed they did not receive phone calls from Robinson-Crews on the night of the murder.
The following Monday, the State disclosed that over the weekend it found discovery item nineteen, the Muncy Report, identifying two inmates that claimed Robinson-Crews admitted her role in the murder of her husband. The trial court conducted an N.J.R.E. 104 hearing on the State's discovery violations. Counsel elicited testimony from Detectives Terman, Britton, and Bolognini. Detectives Terman and Britton testified that eighteen reports *85 were in the State's possession since their creation. Detective Britton also testified that he received the Muncy Report more than a year and a half before the trial began and that he recalled speaking with Cappelli and another inmate whose name he did not remember regarding conversations with Robinson-Crews. Additionally, Detective Bolognini testified that when the evidence was located, he remembered speaking to Detective Norton in the early morning hours shortly after the murder, though he did not remember the details of the conversation.
At the close of the hearing, defendants moved to dismiss the indictment with prejudice. Defense counsel specifically chose to move for a dismissal with prejudice rather than a mistrial because they did not "want to give the State a second bite at the apple."
The trial judge stated that he was "not in a position" to rule on the defense motion for dismissal of the charges and never specifically denied the motion on the record. The trial judge did say that **511 the women named in the Muncy Report were likely not credible, and had "to be looked at very skeptically." The court allowed defense counsel to call Cappelli as a witness at trial by videoconference, cross-examine Robinson-Crews on her statements to Cappelli, and cross-examine Detective Britton on his undocumented meeting with Cappelli.
E. Evidentiary Rulings: Withheld Evidence & Crews's Dying Declaration
The trial proceeded, and the prosecutor called Robinson-Crews to testify as to events on the day of the murder. Robinson-Crews explained that Brown lived with her and Crews for a time and that she had seen Dawson only with Brown. On cross-examination, Dawson's attorney elicited from Robinson-Crews that after her husband's death, she had taken over his lucrative drug-dealing operation; that there were significant discrepancies between her trial testimony and her previous statements to police; and that she filed a false police report against Brown. Dawson's attorney also asked Robinson-Crews if she lied to the police in her initial statements to protect Crews's drug operation or because she was involved in his murder. Robinson-Crews responded that she lied because she "wanted them in jail."
The prosecutor then argued to the court that this cross-examination of Robinson-Crews by defense counsel opened the door to testimony about Crews's dying declaration. The trial judge initially disagreed, stating, "She indicates she lied, she lied, she lied. I don't see that as the door having been opened." Nevertheless, the next day the judge held an N.J.R.E. 104 hearing to reconsider the admissibility of Crews's purported dying declaration. In making this decision, the judge said, "The question now is whether or not something was done that changed the lay of the land and it should allow the State to go into that issue, at least, insofar as having the Court explore it again."
After Robinson-Crews and Rivera-Rodriguez testified at the N.J.R.E. 104 hearing, the trial judge reversed the motion judge's holding and allowed Robinson-Crews to testify to the jury about **512 the dying declaration. In reaching his conclusion, the trial judge first discounted the testimony of Rivera-Rodriguez, who acknowledged that "if the man did say something to the woman, [he] would not have heard it."
Moreover, the trial judge doubted Rivera-Rodriguez due to his consumption of alcohol that night, stating, "There's no question about it. William Rivera had a six pack. He had a couple of shots as well .... [H]e certainly was impaired somewhat under *86 any standard." As to Robinson-Crews, the judge said, "I think a jury could fairly accept the testimony of Robinson-Crews in an evaluation of what she heard at the time."
The judge also ruled that Portis could testify regarding what Robinson-Crews claimed to her Crews said as he was dying -- that Paperboy and Youngin shot Crews. Defendants objected to admission of Portis's testimony as evidence to rebut a charge of recent fabrication under N.J.R.E. 803(a)(2). Defendants claimed at trial, and claim here, that mentioning Youngin (Dawson) as part of the dying declaration was a recent fabrication.
On cross-examination, Portis testified that when she looked at the still photograph from a surveillance video of the night of the murder she identified Dawson because she "knew it wasn't Paperboy [ (Brown) ], so it had to be Youngin [ (Dawson) ]," even though she had only seen Dawson five times in her life. Portis also stated that she believed Robinson-Crews was involved in the murder of her son.
The trial continued with the testimony of Franklin and Black, the two jailhouse informants, who stated that both Brown and Dawson admitted that they had attempted to rob Crews of $40,000 but that the robbery went awry when Robinson-Crews and her child "showed up." Franklin and Black each testified that Dawson said he was the shooter. Finally, Black testified, without objection, that Dawson said that Crews stated, after Dawson shot him, "I can't believe Paper and Youngin would do this to me."
**513 F. Evidentiary Ruling: Exclusion of the Norton Affidavit
Following the testimony of Franklin and Black, the two jailhouse informants, defense counsel sought to introduce into evidence the Norton Affidavit to impeach Robinson-Crews's credibility and, specifically, her testimony about Crews's dying declaration. The court conducted an N.J.R.E. 104 hearing to determine the admissibility of the Norton Affidavit, which referred to two phone calls made by Robinson-Crews that were overheard by Detective Bolognini. At the hearing, Detective Bolognini testified he remembered standing close to Robinson-Crews in the hours following the murder and, while he remembered that she was frantic and loud and made multiple phone calls, Detective Bolognini did not remember the substance of the conversations since they happened more than six years before. However, he stated "because it's in the search warrant, it obviously did happen and I did report it, yes."
Detective Norton testified at the N.J.R.E. 104 hearing that he did not remember the details of his conversation with Detective Bolognini, but it was very important for him to be accurate and thorough when preparing a search warrant affidavit. Detective Norton also explained that Robinson-Crews's statements in the affidavit were "in quotes so I'm not 100 percent, but I'm pretty certain that Detective Bolognini gave me this information directly." He further testified that he believed the information contained in the Affidavit was trustworthy or he would not have presented it to the judge as part of a search warrant application.
Defense counsel argued that the Norton Affidavit should be admitted under N.J.R.E. 803(c)(5) as past recollection recorded. However, the trial court ruled that the Norton Affidavit was inadmissible as untrustworthy based upon the "remarkable" inability of Detective Bolognini to recall any of the conversations; the absence of any reference to the statements in any formal reports authored by any officers regarding the incident; and Detective Norton's *87 inability to point, with any certainty, to his source of the information. **514 G. Verdict, Sentence, & Post-Trial Motions
At the conclusion of the trial, a jury found both defendants guilty of counts one, three, and four. The trial court sentenced each defendant to a fifty-year term of imprisonment for Crews's murder with eighty-five percent periods of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2 ; a concurrent twenty-year term for robbery; and a concurrent ten-year term for the weapon charge.
Defendants each moved for a judgment of acquittal notwithstanding the verdict, pursuant to Rule 3:18-2 or, in the alternative, for a new trial, pursuant to Rule 3:20-1. Although Dawson did not state specifics in his motion, Brown detailed these points:
[D]efendant's right to due process and a fair trial was irreparably impaired by the Court's
a. Decision after the trial commenced, to reverse a pretrial evidentiary ruling of Judge Billmeier which had the effect of admitting into evidence previously barred testimony of an alleged dying declaration by the decedent which Judge Billmeier found unreliable;
b. Decision to bar the past recollection recorded testimony of Officer Bolognini, who had reported to the other officers at the crime scene that he overheard the decedent's wife, Sheena Robinson[-]Crews, speaking to someone who could reasonably be inferred to be the actual murderer of the decedent, Tracy Crews, thereby eviscerating the defendant's third party guilt defense;
c. Refusal to dismiss the State's case after the jury was empaneled and it came to light that the State had failed to turn over numerous reports in pretrial discovery including reports containing potentially exculpatory evidence and evidence of third party guilt ....
The judge denied both motions, and defendants appealed.
H. Appellate Division Judgment
The Appellate Division affirmed both defendants' convictions and sentences. In deciding whether the State's delayed disclosure of nineteen police reports was a Brady violation, the Appellate Division focused on the Muncy Report and Norton Affidavit. The panel, citing Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), found that, although the State should have disclosed the evidence, the trial "judge did not err by failing to dismiss the charges against defendant[s]." In doing so, the **515 Appellate Division reasoned that defendants failed to show any undue prejudice, as the trial court took reasonable measures to ensure a fair trial by allowing the defense time to review the documents and by allowing Cappelli to testify.
As to the trial court's admission of Crews's dying declaration, the panel was satisfied that Robinson-Crews's testimony was "sufficiently credible to allow it to be presented to the jury." Citing N.J.R.E. 803(a)(2), the panel next found that the trial court did not err by admitting Portis's testimony because "defense counsel essentially charged Robinson-Crews with a recent fabrication and an attempt to cover up her own involvement with the charged offense .... [Portis's] testimony ... was admissible ... to rebut these allegations." Recognizing that the decision to admit Crews's dying declaration was a reversal of the trial court's pretrial holding, the panel noted that application of the "law of *88 the case" doctrine is discretionary and is to be "flexibly applied in the interests of justice."
The Appellate Division also found that defendants' unwitting statements to Franklin and Black, two jailhouse informants, did not implicate the Confrontation Clause, and that the trial court properly denied defendants' motions for a new trial since the verdicts were not against the weight of the evidence.
We granted defendants' petitions for certification. 231 N.J. 526, 177 A.3d 109 (2017) ; 231 N.J. 533, 177 A.3d 113 (2017).
III. Parties' Arguments
A. Defendants
Brown and Dawson seek reversal of their convictions and dismissal of their indictment, or alternatively, a retrial. They raise five issues before this Court.
First, citing Brady v. Maryland, defendants claim that the State's failure timely to turn over nineteen discovery items that were in its possession for years, including investigative reports, search warrant applications, and the Norton Affidavit, violated defendants' right to a fair trial. Defendants note that those discovery items were not received until after defense counsel made **516 their opening remarks and four State's witnesses, to whom the items were relevant, had testified. That due process violation requires dismissal of the indictment, and retrial would violate the Double Jeopardy Clause of the New Jersey State Constitution, defendants claim.
Second, citing the law of the case doctrine, defendants argue that the trial court should not have reversed the motion judge's decision and admitted Robinson-Crews's testimony about the dying declaration of her husband. Defendants contend that counsel's questions did not "open the door" to the dying declaration and that, if they did, the trial court's response was extreme and unduly prejudicial. Defendants acknowledge that the trial judge was entitled to arrive at his own credibility findings but argue that the impact of the late admission of the evidence changed the tenor of the case and unfairly prejudiced defendants, necessitating reversal.
Defendants' final three arguments relate to the Norton Affidavit, Portis's testimony, and the testimony of jailhouse informant Black. Specifically, defendants assert that the trial court abused its discretion by barring the Norton Affidavit, which they argue was admissible as Detective Bolognini's past recollection recorded under N.J.R.E. 803(c)(5), an exception to the rule against hearsay. Dawson adds that, because he was not mentioned in the dying declaration, the trial court erred in admitting Portis's testimony, under the N.J.R.E. 803(a)(2) hearsay exception, to rebut an express charge of recent fabrication. As a final point, Dawson also claims that Black's testimony -- that, while in prison, Brown informed Black that the two wore ski masks during the robbery of Crews and that once Crews recognized them, Dawson shot him -- violated his Sixth Amendment Confrontation Clause rights because Brown did not testify and was not subject to cross-examination.
B. The State
The State contends that, because there is no evidence in the record that the delayed disclosure of evidence was intentional, and the late production did not prejudice defendants, there was no **517 Brady violation. The State maintains that if this Court concludes that defendants were prejudiced, it would be improper to dismiss the indictment.
The State agrees with the Appellate Division that the trial court did not violate the law of the case doctrine by admitting *89 Crews's dying declaration. In doing so, it notes that the trial court's ruling is afforded substantial deference because the law of the case doctrine is a non-binding, discretionary rule. To the State, the additional testimony of Rodriguez-Rivera and Robinson-Crews during the N.J.R.E. 104 hearing provided the trial court with a more complete picture of what occurred on the night of the shooting. The State therefore claims that the trial court was well within its discretionary authority not to apply the doctrine. The State adds that Portis's testimony, which recounted the conversations she had with Robinson-Crews, were properly admitted under N.J.R.E. 803(a)(2) to rebut the assertion that Robinson-Crews, to shift the blame from herself, fabricated her trial testimony regarding the dying declaration.
The State also asserts that the Appellate Division properly affirmed the trial court's exclusion of the Norton Affidavit, which referred to Robinson-Crews's cell-phone calls to unknown recipients. The State argues that after hearing from the witnesses and observing their demeanor, the trial court properly decided that the circumstances surrounding the recording of the statements did not demonstrate trustworthiness. Moreover, the State claims that the exclusion of these statements did not cast a reasonable doubt upon the verdicts.
Finally, the State asserts that defendants were not prejudiced by cumulative error and that, although they did not receive a perfect trial, they received a fair trial.
IV. Discussion
A. Withheld Evidence & Due Process under Brady v. Maryland
We begin our discussion by reviewing Brady v. Maryland and its application. In Brady, the defendant sought pretrial discovery **518 of statements made by his codefendant. 373 U.S. at 84, 83 S.Ct. 1194. The State provided to the defendant, Brady, all but one such statement. Ibid. After the jury convicted Brady and his codefendant of murder in the course of a robbery, Brady discovered that the State suppressed a pretrial statement made by his codefendant, in which the codefendant confessed to strangling the victim. Ibid. Although the United States Supreme Court found that the codefendant's confession would not have affected the jury's guilty finding as to Brady, since he admitted to the robbery, the Court held that the statement might have affected Brady's punishment. Id. at 90-91, 83 S.Ct. 1194. The Court ruled that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87, 83 S.Ct. 1194.
Three essential elements must be considered to determine whether a Brady violation has occurred: (1) the evidence at issue must be favorable to the accused, either as exculpatory or impeachment evidence; (2) the State must have suppressed the evidence, either purposely or inadvertently; and (3) the evidence must be material to the defendant's case. See State v. Nelson, 155 N.J. 487, 497, 715 A.2d 281 (1998). The existence of those three elements evidences the deprivation of a defendant's constitutional right to a fair trial under the due process clause. See Brady, 373 U.S. at 87, 83 S.Ct. 1194 ; see also State v. Carter, 91 N.J. 86, 111-12, 449 A.2d 1280 (1982).
Determining whether the first two Brady elements have been satisfied is a straightforward analysis. In most settings, however, the principles of Brady are invoked when the suppressed evidence is *90 discovered post-trial. Because that is not the case here, determining the third element -- whether the suppressed evidence is material -- is far more arduous. In deciding materiality, "we examine the circumstances under which the nondisclosure arose" and "[t]he significance of a nondisclosure in the context of the entire record." **519 State v. Marshall, 123 N.J. 1, 199-200, 586 A.2d 85 (1991) (citing United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ). In determining the effect of the withheld evidence "in the context of the entire record," id. at 200, 586 A.2d 85, we consider the strength of the State's case, the timing of disclosure of the withheld evidence, the relevance of the suppressed evidence, and the withheld evidence's admissibility.
B. The First & Second Brady Elements
The first Brady element -- whether the State withheld evidence favorable to defendants, either as exculpatory or impeachment evidence -- is clearly satisfied here. The Norton Affidavit included statements from an officer who overheard Robinson-Crews make inculpatory remarks on her cell phone hours after the shooting. The affidavit evidences that Robinson-Crews may have known who the murderers were or even had some part in the crime.
The Norton Affidavit, produced well into the trial, was the first evidential support defendants received for a theory of third-party guilt. The defendants' cell-phone records, which show no calls from Robinson-Crews on the night of Crews's murder and which were obtained by defense counsel only after they received the Norton Affidavit and the Muncy Report, further support the defense of third-party guilt. The withheld evidence also contained a report of a canine search completed the night of the murder. The report of the canine search detailed a path followed by the dogs that contradicted testimony already given by State witnesses.
Withholding the above reports deprived defense counsel of the opportunity to cite the evidence of third-party guilt in their openings and to cross-examine the four officers who had already testified against defendants about evidence acquired at the crime scene and referred to in the withheld documents.
The second Brady element -- whether the State suppressed the evidence either purposely or inadvertently -- is also satisfied here. The State acknowledges that the withheld reports "were in a file that was actually in [the State's] office in homicide" for a **520 significant time before trial, and the State did not provide the evidence to defendants until well into their murder trial. See Carter, 91 N.J. at 111, 449 A.2d 1280. The second Brady element is satisfied since "[t]he prosecutor is charged with knowledge of evidence in his file." Ibid. (quoting Agurs, 427 U.S. at 110, 96 S.Ct. 2392 ).
C. The Third Brady Element, in Light of the Evidentiary Rulings
The third Brady element requires that the suppressed evidence be material to defendants' case. Establishing materiality "does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Instead, the inquiry is "whether in the absence of the undisclosed evidence the defendant received a fair trial, 'understood as a trial resulting in a verdict worthy of confidence.' " Nelson, 155 N.J. at 500, 715 A.2d 281 (quoting Kyles, 514 U.S. at 434, 115 S.Ct. 1555 ). The significance of the *91 nondisclosure "depends primarily on the importance of the [evidence] and the strength of the State's case against [a] defendant as a whole." Marshall, 123 N.J. at 200, 586 A.2d 85. Said another way, evidence is material if there is a "reasonable probability" that timely production of the withheld evidence would have led to a different result at trial. United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).
Here, the State's case against defendants relied, in part, upon Robinson-Crews's testimony that her husband, as he lay dying, implicated defendants. However, Robinson-Crews gave inconsistent statements to police, erroneously implicated Dawson in Crews's dying declaration, and filed a false police report against Brown after the murder.
The State also relied upon the following circumstantial evidence: Brown could not be excluded as a contributor to the DNA from a ski mask found near the crime scene; testimony from jailhouse **521 informants Franklin and Black; testimony from Robinson-Crews; and testimony from Portis regarding the dying declaration and Dawson's identification. This circumstantial evidence of defendants' guilt was, likewise, assailable. Brown's DNA was not a conclusive match to the DNA from the ski mask; jailhouse informants Franklin and Black received very favorable plea deals[3] from the State after revealing that defendants made incriminating statements while in the Mercer County Correctional Center; and Portis identified Dawson from a surveillance video-still, even though she had seen him only five times previously.
Because counter-arguments were available to challenge a great deal of the evidence on which the State relied at trial, our materiality inquiry is influenced by the following two evidentiary rulings made after the withheld evidence was provided to defendants: (1) overturning a pretrial determination that excluded Crews's dying declaration; and (2) excluding the Norton Affidavit as unreliable. Those determinations affected what the State and defense were able to rely on, and no consideration of whether the trial could have ended differently had the exculpatory evidence been timely disclosed would be complete without consideration of whether those evidentiary rulings properly circumscribed the admissible evidence.
In evaluating the trial court's evidentiary rulings, we first acknowledge that appellate courts " 'generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken understanding of the applicable law.' " Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371, 25 A.3d 221 (2011) (quoting **522 Rivers v. LSC P'Ship, 378 N.J. Super. 68, 80, 874 A.2d 597 (App. Div. 2005) ). The abuse of discretion standard instructs us to "generously sustain [the trial court's] decision, provided it is supported by credible evidence in the record." Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 384, 997 A.2d 954 (2010).
Our determination of whether the trial court abused its discretion by reversing the motion judge's ruling and admitting Crews's dying declaration implicates the *92 "law of the case doctrine" and N.J.R.E. 804(b)(2), the dying declaration exception to the rule against hearsay. The trial court's exclusion of the Norton Affidavit implicates N.J.R.E. 803(c)(5), the hearsay exception for past recollection recorded.
1. Admission of the Dying Declaration
We first assess whether the trial court erred by overturning a pretrial determination that excluded Robinson-Crews's hearsay testimony that, as Crews lay dying, he accused Paperboy of his murder. In doing so, the trial court did not follow the "law of the case doctrine." State v. Ruffin, 371 N.J. Super. 371, 390, 853 A.2d 311 (App. Div. 2004). The doctrine, whose application is discretionary, "is designed to avoid re-litigation of the same issue in the same controversy." Ibid.
N.J.R.E. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is generally inadmissible, but there are exceptions. See N.J.R.E. 802. The dying declaration exception allows a "[s]tatement under belief of imminent death" to be "admissible if it was made voluntarily and in good faith and while the declarant believed in the imminence of declarant's impending death." N.J.R.E. 804(b)(2).
Here, the motion judge excluded Crews's dying declaration as unreliable hearsay at the pretrial phase. The trial judge reversed his colleague's ruling because he found that defense counsel **523 "opened the door" by challenging Robinson-Crews's credibility during cross-examination about her admitted lies.
"Opening the door" is a tenet that prevents a party from excluding certain evidence from the opposing party's case-in-chief by pretrial motion, and later introducing evidence that would be undermined by the previously excluded evidence. State v. Prall, 231 N.J. 567, 582-83, 177 A.3d 755 (2018). The trial court here believed that it was illogical that Robinson-Crews would lie to police by filing a false police report against Brown without a motive, and that the motive was her husband's dying declaration. We do not find that the trial court abused its discretion in this regard by disregarding the law of the case doctrine for the following reasons.
The parties agree that Crews would have known he was dying when he made the purported statement. Additionally, although a "dying declaration may be excluded if the declarant did not have direct personal knowledge of the statement's basis," id. at 585, 177 A.3d 755, the circumstances as presented suggest, and the parties do not dispute, that Crews presumably saw who killed him. Therefore, the statement qualifies as a dying declaration under N.J.R.E. 804(b)(2). Still, the trial court must weigh, under N.J.R.E. 403, probative value of the dying declaration against the prejudice to defendants of its admission.
N.J.R.E. 403 instructs that "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of ... undue prejudice." Unquestionably, Crews's dying declaration had substantial probative value; it is the most impactful evidence the State could offer in this case to establish defendants' guilt. Indeed, evidentially, admission of "a dying declaration is often terrible in its consequence and well nigh impossible to counter. It has been described as 'devastating' in its impact." State v. Hegel, 113 N.J. Super. 193, 202, 273 A.2d 383 (App. Div. 1971) (quoting State v. Yough, 49 N.J. 587, 598, 231 A.2d 598 (1967) ).
**524 The trial judge concluded that the dying declaration should be admitted and the jury should determine the statement's *93 reliability and Robinson-Crews's credibility. In doing so, the trial court did not specifically consider that his decision to admit the dying declaration occurred well into defendants' murder trial.
All the same, we do not find that the trial judge abused his discretion by overturning a pretrial ruling excluding Crews's dying declaration. Crews's dying declaration was admissible through Robinson-Crews under the N.J.R.E. 804(b)(2) hearsay exception. We repeat, however, that the decision to admit Crews's dying declaration occurred after counsel gave opening statements and four State witnesses had testified. Admission of the dying declaration also preceded exclusion of the Norton Affidavit. It is in this setting that we assess the trial court's decision to exclude the Norton Affidavit.
2. Exclusion of the Norton Affidavit
The Norton Affidavit is evidence that could have reduced the impact of Robinson-Crews's testimony as to Crews's dying declaration. The Affidavit contains statements by Detective Bolognini describing a phone conversation that he overheard the night of the murder in which Robinson-Crews said, "Those boys did not have to shoot him." This evidence undermines the credibility of the testifying witness, Robinson-Crews, raises the specter of her involvement in Crews's murder, and is evidence of third-party guilt. We must consider the affidavit's admissibility under N.J.R.E. 803(c)(5), the hearsay exception for a recorded recollection.
Under N.J.R.E. 803(c)(5), a hearsay statement is admissible "to refresh one's recollection." State v. Gore, 205 N.J. 363, 375, 15 A.3d 844 (2011). N.J.R.E. 803(c)(5) provides that the statement is admissible as a recorded recollection if
(A) [it] was made at a time when the fact recorded actually occurred or was fresh in the memory of the witness, and
(B) [it] was made by the witness or under the witness' direction or by some other person for the purpose of recording the statement at the time it was made, and **525 (C) the statement concerns a matter of which the witness had knowledge when it was made, unless the circumstances indicate that the statement is not trustworthy; provided that when the witness does not remember part or all of the contents of a writing, the portion the witness does not remember may be read into evidence but shall not be introduced as an exhibit over objection.
[ N.J.R.E. 803(c)(5).]
At an N.J.R.E. 104 hearing conducted by the trial court, Detective Norton testified it was important for him to be accurate and thorough when preparing a warrant affidavit. He further testified that he believed the information contained in the affidavit was trustworthy or he would not have presented it to the judge. Nevertheless, the trial court excluded the affidavit as unreliable, relying on Detective Bolognini's inability at the N.J.R.E. 104 hearing to remember the precise statements made by Robinson-Crews on the night of the murder over six years before and absence of corroboration of these statements. After considering the record of the trial court's N.J.R.E. 104 hearing, we reach a different conclusion.
Here, the Norton Affidavit was used in four separate search warrant applications. It reports that Detective Bolognini overheard Robinson-Crews make inculpatory statements while speaking on her cell phone at the crime scene. Nearby surveillance video footage of the crime scene showing Detective Bolognini near Robinson-Crews supports that she was on the *94 phone and that the detective was within earshot of her. The records of defendants' known cell phones show they did not receive these phone calls. Additionally, Detective Norton spoke to Detective Bolognini the night of Crews's murder, recorded their conversation, and presented and swore before a judge to the veracity of the information hours after the murder took place.[4] While the decision to admit or exclude evidence is "firmly entrusted to the trial court's discretion," **526 we find that the trial court abused its discretion by excluding this affidavit. Estate of Hanges, 202 N.J. at 383-84, 997 A.2d 954 (citing Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492, 734 A.2d 1147 (1999) ).
The trial judge concluded that the Norton Affidavit was unreliable because of the "remarkable" inability of Detective Bolognini to recall any of the conversations, the absence of any reference to the statements in any formal reports authored by any officers regarding the incident, and Detective Norton's inability to point, with any certainty, to his source of the information. These findings are inconsistent with the testimony of Detectives Bolognini and Norton about the affidavit's creation, accuracy, and trustworthiness. The surveillance video confirmed that Detective Bolognini was in a position to hear what is set forth in the Norton Affidavit. Most importantly, the trial judge's conclusions ignore that N.J.R.E. 803(c)(5) requires trustworthiness, not corroboration, and specifically allows "that when the witness does not remember," as was the case here, "part or all of the contents of a writing, the portion the witness does not remember may be read into evidence." Ibid. (emphasis added). Therefore, we find Detective Norton should have been permitted to read to the jury the contents of his affidavit.
3. Due Process & the Third Brady Element (Materiality)
Having considered the trial court's evidentiary rulings, we now consider their effect upon our Brady analysis. As to the third Brady element, materiality, we repeat that the trial court admitted the dying declaration one week after the trial began. Defense counsel had already made opening statements revealing their trial strategy. Four Trenton police officers had testified about the night of the murder and the gathered evidence. Although it was proper to admit the dying declaration, the timing of the decision to admit it was highly prejudicial to the defense.
That prejudice was compounded by the trial court's later exclusion of the Norton Affidavit. It was error to exclude the affidavit, and that error deprived defendants of evidence of third-party **527 guilt, as well as an opportunity to use the Norton Affidavit to challenge Robinson-Crews's credibility and her testimony about the dying declaration. We cannot conclude, in light of the timing of the State's disclosure of withheld evidence and the trial court's relevant evidentiary rulings, that allowing defendants to call Cappelli as a witness, or allowing defendants to cross-examine Detective Britton about the Muncy Report, substantially lessened the impact of Crews's dying declaration and ameliorated the court's error.
Consequently, the State's Brady violation, in the context of the trial court's evidentiary rulings, undermines our confidence in the jury's guilty verdict against the defendants. See *95 Kyles, 514 U.S. at 434, 115 S.Ct. 1555. Because we find there is a "reasonable likelihood" that the State's Brady violation, in light of the trial court's evidentiary rulings, affected the judgment of the jury, Giglio, 405 U.S. at 154, 92 S.Ct. 763, we find that the third Brady element is satisfied.
V. Remedy
A. Dismissal of the Indictment with Prejudice vs. New Trial
Having resolved that the State infringed upon defendants' due process rights by violating the commands of Brady, we must determine the appropriate remedy. Defendants did not ask for a mistrial after discovery of the withheld evidence. Instead, defendants moved for dismissal of defendants' indictment with prejudice. Defendants claim that they moved for dismissal with prejudice, instead of a mistrial, to preserve their right to invoke the bar of double jeopardy.
Double jeopardy, under Article 1, Paragraph 11 of the New Jersey Constitution, is "[t]he principle that no person is to be placed in jeopardy 'more than once for the same offense.' " State v. Allah, 170 N.J. 269, 278, 787 A.2d 887 (2002) (citing, among other sources, United States v. Wilson, 420 U.S. 332, 339-42, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975) ). However, in this setting the bar of double jeopardy is limited to "those cases in which the conduct **528 giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." Oregon v. Kennedy, 456 U.S. 667, 679, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). Similarly, in the context of a Brady violation, the remedy of dismissal of an indictment with prejudice is utilized when "the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." United States v. Russell, 411 U.S. 423, 431-32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). We say again that defendants do not claim that the State acted willfully in withholding evidence. As there is no evidence or allegation that the State intentionally withheld Brady information, and no evidence of prosecutorial provocation or other willful misconduct, the bar of double jeopardy does not apply here.
Still, under Brady, a new trial is required if suppression of evidence prejudices defendant and "could ... in any reasonable likelihood have affected the judgment of the jury." Giglio, 405 U.S. at 154, 92 S.Ct. 763 (ellipsis in original) (quoting Napue v. Illinois, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) ). Because we conclude that the State's Brady violation, in the circumstance of the trial court's evidentiary rulings, undermines our confidence in the jury's verdict of guilty against the defendants, see Kyles, 514 U.S. at 434, 115 S.Ct. 1555, a new trial is required.
B. Guidance as to Evidentiary Issues on Retrial
The court on retrial will face evidentiary issues raised in this appeal. The first such issue is whether Portis may testify that Robinson-Crews said "Paperboy and Youngin" murdered Crews. Second, the court must determine whether the testimony of Black, a jailhouse informant, contained statements that violated defendant Dawson's Sixth Amendment Confrontation Clause rights. We provide the following for guidance.
The State offered Portis's testimony to rebut an express charge against Robinson-Crews of recent fabrication. In that regard, N.J.R.E. 803(a)(2) excludes from the hearsay rule
*96 **529 [a] statement previously made by a person who is a witness at a trial or hearing, provided it would have been admissible if made by the declarant while testifying and the statement: ... is consistent with the witness' testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive.
Under this hearsay exception, the evidence is subject to an N.J.R.E. 403 analysis to determine if its probative value is substantially outweighed by its prejudicial effect.
The trial record before us shows that Portis testified that Robinson-Crews called her several times on the night of Crews's murder. During one call, Robinson-Crews told Portis that "Youngin and Paperboy had shot Tracy." As to the portion of the statement inculpating Brown, it qualifies as admissible hearsay under N.J.R.E. 803(a)(2). However, Robinson-Crews admitted before trial that she fabricated Dawson's part in the dying declaration. Thus, Portis's reference to Dawson has little if any probative value but is highly prejudicial as to Dawson. Therefore, Portis's statement can be offered as a statement to rebut a charge of recent fabrication under N.J.R.E. 803(a)(2), but only as to Brown.
Regarding Dawson's claim that testimony of jailhouse informant Black referred to statements by Brown implicating Dawson, we recognize that admission of hearsay statements of a defendant implicating a co-defendant are inadmissible when the defendants are tried together. Bruton v. United States, 391 U.S. 123, 135-36, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Here, a careful review of the trial record shows that the informant's challenged testimony reveals only what Brown said about his own actions, not the actions of his co-defendant. Nevertheless, while the testimony in the record before us did not implicate a Bruton issue, on remand the trial court should review, pretrial, offered testimony of jailhouse informants Black and Franklin to determine and resolve any Bruton issues.
VI. Judgment
For the reasons set forth above, we reverse the judgment of the Appellate Division, vacate defendants' convictions, and remand for a new trial.
CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, and TIMPONE join in JUSTICE SOLOMON'S opinion.

Initially, the investigation was led by Trenton Police Detective Michael Terman, whose only role in the trial was to establish where the nineteen discovery items were held until their disclosure.

Defense counsel argues that the canine search led officers in directions other than where the ski mask which the State tested for DNA was found. However, the record before the Court states only that the dogs led officers in multiple directions.

Franklin was charged in five armed robberies and, in exchange for his testimony at trial, pleaded guilty to aggravated assault and received an eighteen-month sentence. Franklin was released from jail the day he gave the police an initial statement implicating defendants. Black was charged in two armed robberies. In exchange for his testimony, Black pleaded guilty to theft and received a sentence of five years' probation conditioned upon serving 365 days in county jail.

Crews was shot late on the night of September 12, 2008 and died at the hospital in the early morning hours of September 13, 2008. The investigation at the crime scene continued through the early morning hours of September 13, 2008. The Norton Affidavit was presented to a trial judge by Detective Norton on September 13, 2008.