# **RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0276-24

STATE OF NEW JERSEY,

     Plaintiff-Appellant,

v.

R.F.P.,[1]

     Defendant-Respondent.

_____

K.S.,

     Intervenor-Appellant.

_____

Argued February 26, 2025 – Decided March 19, 2025

Before Judges Mayer, DeAlmeida and Puglisi.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 23-03-0337.

---

[1]  We use initials and pseudonyms to protect the privacy interests of alleged victims of sexual offenses in accordance with Rule 1:38-3(c)(12).

Deepa S. Y. Jacobs, Assistant Prosecutor, argued the cause for appellant (Mark Musella, Bergen County Prosecutor, attorney; Deepa S. Y. Jacobs, of counsel and on the brief).

Alyssa Aiello, Assistant Deputy Public Defender, argued the cause for respondent (Jennifer N. Sellitti, Public Defender, attorney; Alyssa Aiello, of counsel and on the brief).

Richard D. Pompelio argued the cause for intervenor K.S. (New Jersey Crime Victims' Law Center, attorneys; Richard D. Pompelio, of counsel and on the brief; Dyanne Veloz Lluch, on the brief).

PER CURIAM

By leave granted, the State, joined by interventor K.S. (Kim), the alleged victim in this matter, appeals from the May 21, 2024 Law Division order granting defendant R.F.P.'s (Ryan) motion for an in camera review of Kim's pre-incident mental health records and the August 26, 2024 order denying the State's motion for reconsideration. We reverse both orders.

I.

In April 2021, eighteen-year-old Kim moved into a house shared by her biological father A.G. (Andrew), his brother Ryan, his sister T.G. (Tamara) and Tamara's boyfriend S.G. (Scott). On May 30, 2021, Kim told Andrew that Ryan had sexually assaulted her the day before.

Andrew took Kim to the hospital, where a sexual assault nurse examiner (SANE) performed a forensic examination. According to the medical history documented in the SANE report, Kim had been diagnosed with autism, bipolar I disorder, post-traumatic stress disorder (PTSD), asthma, seizures, hypothyroidism and anxiety, and was prescribed several medications to treat these conditions.

Kim also provided a sworn statement to detectives, wherein she stated she was home alone with Ryan the day before. She said she went to retrieve her cat in the bedroom shared by Andrew and Ryan. Kim said Ryan, who was in the bedroom, kissed her on her forehead, lips and breasts, and then touched her vagina. He then pushed her onto a bed, penetrated her vagina with his penis, and performed cunnilingus on her without her consent.

The day after Kim gave her statement to police, she called 911 and reported she was assaulted by Tamara. Responding police observed redness on Kim's face and Tamara was charged with simple assault as a result of this incident.

Ryan was charged in a superseding Bergen County indictment with second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1) (counts one, two and three); fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b) (counts four

and five);[2] fourth-degree obstruction of the administration of law, N.J.S.A. 2C:29-1 (count six); third-degree hindering, N.J.S.A. 2C:29-3(b)(4) (count seven); and fourth-degree fabricating physical evidence, N.J.S.A. 2C:28-6(2) (count eight).[3] In a statement to police, Ryan did not deny the sexual encounter recounted by Kim but asserted it was consensual.

In August 2023, Ryan moved for an in camera review and subsequent release of Kim's pre-incident mental health records, citing State v. Chambers, 252 N.J. 561 (2023). In support of his motion, Ryan relied on the SANE report, text messages exchanged between Kim and her former boyfriend I.S. (Ivan) the evening of the purported sexual assault, and four post-indictment unsworn reports authored by Ryan's investigator.[4] The reports documented the

---

[2]   The superseding indictment alleged Ryan committed the sex offenses on March 29, 2021, but the remainder of the record, along with the parties' briefs, indicate the date was May 29, 2021.

[3] Counts six, seven, and eight relate to three emails Ryan produced to the State, seeking to have the sex offenses dismissed. The emails were dated August 21, 22 and 24, 2021 and purported to be from Kim, apologizing for lying and stating she wanted to drop the charges. The State's investigation revealed the emails were sent to Ryan from his own internet protocol address, using an email account opened on August 21 and closed on August 24. Thus, the State alleged Ryan sent the emails to himself.

[4]   The investigative reports were hearsay records documenting unsworn statements, some of which contained hearsay-within-hearsay statements. See N.J.R.E. 801(c), 805.

A-0276-24

investigator's respective interviews of Tamara, Scott, Ivan and Kim's adoptive mother P.S. (Peggy). The reports are as follows.

Tamara told the investigator Kim bragged to her about making false accusations of sexual assault in the past. Tamara also said Kim had been in "numerous mental hospitals throughout the United States," but did not provide any dates or identify the hospitals.

Scott told the investigator he overheard conversations between Tamara, Kim and Ryan wherein Kim bragged about making false sexual assault and rape claims against other men, which she made because the men no longer wanted a relationship with her or lied to her. Scott stated there were "numerous" men against whom Kim made false allegations, but he was unaware if criminal charges were filed based on her allegations. He also stated Kim's adoptive parents placed her in a "mental hospital" and Andrew signed her out without the knowledge of Kim's adoptive parents.

Ivan told the investigator Kim was diagnosed with autism, anxiety, PTSD and Asperger's syndrome. Although Ivan and Kim had not spoken in a year, he was "fairly certain" Kim was prescribed medication but was not taking it.

Peggy told the investigator she and her husband adopted Kim when Kim was four years old. She said Kim "had many learning disabilities and

5

challenges," but no "definite diagnosis because it [was] hard to pinpoint which disability [Kim had]." She further reported Kim had been in "multiple facilities with varying levels of care," and Andrew and Ryan picked her up from the most recent facility. Peggy was estranged from Kim and did "not know much about her life now," but said Kim was "troubled and it [was] hard to believe what she [said] sometimes." Peggy had not spoken with Kim about her allegations against Ryan.

On April 1, 2024, after considering the March 8, 2024 arguments of defense counsel and the State, the trial court issued an oral decision granting Ryan's motion and ordered the production of Kim's pre-incident mental health treatment records from two hospitals for an in camera review. The trial court's decision was memorialized in a May 21, 2024 order entered "without prejudice as to compelling the production and in camera review of additional pre-incident mental health treatment records that may be identified through the [produced] records or by [Kim] in a hearing pursuant to R[ule] 104."

In its oral decision, the court found:

> The discovery provided by the State and the interviews conducted by the defense investigator with [Kim]'s family members and friends do demonstrate that she has had multiple mental health diagnoses and developmental disabilities that have required multiple hospitalizations.

6

Also, the substance of the interviews with various family and friends of [Kim], although ultimately that may be left to a question for the jury to consider whether or not [Kim]'s accusations are credible, these interviews with family and friends also are consistent with [one] another with respect to a tendency or a knowledge that these witnesses have of . . . a[n] alleged tendency of [Kim] to lie or to fabricate, including about the very substance of the allegations that she has made against [Ryan].

This evidence of pre-incident mental illness establishes certainly, and this court agrees, by a preponderance of the evidence that there is a substantial particularized need for [Kim]'s pre-incident mental health records.

The information sought from these records most certainly is relevant and material to this case as it may indicate that [Kim] may have a proclivity to imagine or fabricate the alleged sexual assault as well as have a bearing on her ability to perceive, recall or recollect, and most certainly this information is not available through any less intrusive means.

So, this court agrees while not agreeing fully that any of these records should just be released to the defense, most certainly the defense has met its burden for the court to conduct an in camera review of [Kim]'s pre-incident mental health records.

The State and Kim, who retained counsel after the trial court ordered the in camera production of her mental health records, timely moved for reconsideration or, in the alternative, for a stay pending interlocutory appeal. On August 26, 2024, the trial court denied both motions and entered conforming

orders. We granted the State's and Kim's emergent applications to stay the May 21, 2024 and August 26, 2024 orders pending appeal and their joint motion for leave to appeal both orders.

On appeal, the State argues the trial court's decision did not comport with Chambers because Ryan failed to prove any nexus between Kim's alleged mental illnesses and her ability to perceive, recall or recount events, or a proclivity to imagine or fabricate them. The State further argues the records are neither relevant nor material, and Ryan may seek to impeach Kim at the time of trial or present witnesses to rebut her version of events.

Ryan argues he made a persuasive evidential showing that connected Kim's mental illnesses to her ability to perceive, recall or recount the alleged sexual assault, or a proclivity to imagine or fabricate claims of sexual assault. Ryan further contends the pre-incident mental health records are relevant and material, and are not available through less intrusive means.

## II.

We "generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken understanding of the applicable law." State v. Knight, 256 N.J. 404, 415 (2024) (quoting State v. Brown, 236 N.J. 497, 521 (2019)) (internal

quotation marks omitted).  However, we "need not defer . . . to a discovery order that is well 'wide of the mark,' or 'based on a mistaken understanding of the applicable law.'"  Id. at 416 (quoting State v. Hernandez, 225 N.J. 451, 461 (2016)).

"An abuse of discretion occurs by making decisions 'without a rational explanation, [that] inexplicably departed from established policies, or [that] rested on an impermissible basis.'"  Chambers, 252 N.J. at 594-95 (alterations in original) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

Our Supreme Court in Chambers "establish[ed] the procedural and analytical framework applicable to a defendant's good-faith discovery request for pre-incident mental health records from a sexual assault victim."  Id. at 570.

Preliminarily, the Court emphasized the victim's constitutional right to notification of the motion by the county prosecutor's office and the opportunity to be heard, with or without independent counsel.  Id. at 589.  The Court then established "a two-stage standard" a defendant must demonstrate in order to justify an in camera inspection.  Id. at 590.  First, a defendant must show, by a preponderance of the evidence:  "(1) that there is a substantial, particularized need for such access; (2) that the information sought is relevant and material;

and (3) that the information is not available through less intrusive means." Id. at 590-91.

To establish a "substantial, particularized need," a defendant must "connect[] the alleged mental illness to the victim's inability to perceive, recall, or recount the events of the alleged assault, or a proclivity to imagine or fabricate them—the sole permissible purpose for which access may be granted." Id. at 590. Access is never justified if it is based only on a "[a] generalized statement the victim is 'crazy,'" or if it is sought "in the hopes of impeaching a victim with inconsistent statements." Ibid.

A defendant must also demonstrate the information sought is not only relevant but also material. "To be relevant, the alleged mental illness of a sexual assault victim must have a 'tendency in reason to prove or disprove' an ability to perceive, recall, or recount the alleged assault, or a proclivity to imagine or fabricate it." Id. at 591. Evidence of a victim's mental illness "may be material to the limited extent that it calls into question the accuracy of a victim's version of events or, more fundamentally, whether the events that a victim alleges even took place." Ibid.

If a defendant establishes these three elements, stage two requires the trial court to conduct an in camera inspection to "determine whether to 'pierce' the

A-0276-24

applicable mental health privilege, redact the pre-incident records, and make them available under a protective order." Id. at 592.

Having reviewed the record in light of our standard of review and the tenets of Chambers, we are persuaded the trial court mistakenly used its discretion in ordering the release of Kim's records for an in camera inspection. Setting aside the hearsay problems with the investigator's reports, the individuals interviewed raised issues of veracity, reliability and bias not addressed by the trial court. Ivan had not spoken with Kim in a year. Peggy was estranged from her and said Kim had never been diagnosed with any disorder or illness. Ryan's sister Tamara was charged with assaulting Kim, and Tamara and her boyfriend Scott were the only individuals who claimed Kim fabricated sexual assault in the past.

And even if the trial court accepted these flawed reports as true, at bottom they established that Kim was diagnosed with autism, bipolar I disorder, Asperger's syndrome, PTSD and anxiety; she had been prescribed medication and may not have been medication compliant; she was hospitalized and had treatment; and she told them she fabricated prior reports of sexual assaults.

Absent from the record before the trial court was any evidence establishing the critical nexus required under Chambers—that Kim's "pre-

11

incident mental health condition [was] connected to her inability to perceive, recall, or recount the events of the alleged assault, or to a proclivity to imagine or fabricate the alleged assault." 252 N.J. at 596. Because Ryan failed to meet this heightened discovery standard, we reverse the orders for disclosure and remand to the trial court for further proceedings.

Lastly, although Kim filed a motion for reconsideration and joined in the State's motion, the record does not indicate whether she was aware of Ryan's initial motion. We remind the State of its duty to provide notice to a victim when a defendant files a Chambers motion, id. at 589-90, and the trial court of its obligation to ensure the record confirms a victim's notice of the motion and the opportunity to oppose it, as required by the Crime Victims' Bill of Rights, N.J.S.A. 52:4B-36(r).

Because we are persuaded the court should not have ordered the release of Kim's mental health records, we need not reach the remainder of the State's arguments raised on appeal.

Reversed and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

12