**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1113-18T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MARVIN WORTHY,

     Defendant-Appellant.

_____

        Submitted November 4, 2019 – Decided March 12, 2020

        Before Judges Vernoia and Susswein.

        On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 02-09-1247.

        Marvin Worthy, appellant pro se.

        Bradley D. Billhimer, Ocean County Prosecutor, attorney for respondent (Samuel J. Marzarella, Chief Appellate Attorney, of counsel and on the brief).

PER CURIAM

In 2004, defendant, Marvin Worthy, was convicted by a jury of first-degree murder, conspiracy to commit murder, and possession of a firearm for an unlawful purpose. The circumstances of the murder plot are chilling. The victim, Rashon Roy, was driven to a predetermined location where he was ambushed and executed at the behest of codefendant Gregory Maples.

Defendant now appeals from the denial of his motion for a new trial based on an alleged Brady[1] violation. He claims the State violated his due process rights by suppressing the report of a muzzle-to-garment forensic examination[2] of the victim's clothing. The New Jersey State Police performed the examination before the 2004 trial, but the report was not disclosed to defendant until 2018 after he requested the report pursuant to the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13. Defendant contends that the test results contradict the

---

[1] Brady v. Maryland, 373 U.S. 83, 87 (1963).

[2] A muzzle-to-garment distance test examines clothing or other objects to see if smoke or partially burned or unburned gunpowder has been deposited. Muzzle to Garment Distance Determination, Vt. Forensic Laboratory, https://vfl.vermont.gov/content/muzzle-target-distance-determination (last visited Feb. 25, 2020). If any gunshot residue is detected on the garment, the examiner looks for the pattern of residue to estimate the distance between the muzzle of a firearm and the garment. Ibid. The more constricted the pattern of gunshot residue, the closer the muzzle was at the moment the weapon was discharged. Ibid.

A-1113-18T2

State's trial theory that the victim had been shot at close range while inside a car.

We have reviewed the record and the parties' contentions in light of the applicable legal standards and affirm the court's denial of defendant's motion for a new trial. We agree with the court that defendant has not shown that it is reasonably probable that the verdict would have been different had the forensic test results been disclosed before trial. Having thus failed to establish all of the required elements of a Brady violation, defendant's motion for a new trial was properly denied.

I.

This murder prosecution has a long procedural history, and this is not the first time we have reviewed defendant's murder conviction. A grand jury indicted defendant on three counts: (1) second-degree conspiracy to commit murder, in violation of N.J.S.A. 2C:11-3(a) or (b) and N.J.S.A. 2C:5-2; (2) first-degree murder, in violation of N.J.S.A. 2C:11-3(a) or (b); and (3) second-degree possession of a weapon for an unlawful purpose, in violation of N.J.S.A. 2C:39-4(a).

A jury convicted defendant of all the charged offenses. The trial judge initially sentenced defendant to an aggregate of thirty years in prison with a

thirty-year period of parole ineligibility on the murder and conspiracy convictions, and ten years in prison with a five-year period of parole ineligibility on the firearm possession conviction. The court later amended the judgment of conviction to clarify that all of the offenses merged into the murder conviction.

On direct appeal, we affirmed defendant's conviction. State v. Worthy, No. A-1846-04 (App. Div. Dec. 22, 2006). The New Jersey Supreme Court denied his petition for certification. State v. Worthy, 190 N.J. 396 (2007).

Defendant then filed his first petition for post-conviction relief (PCR), which the PCR judge denied. Defendant appealed the denial of the PCR. However, while that appeal was pending, defendant filed a second PCR petition. The PCR judge dismissed that second petition pursuant to Rule 3:22-3 because the first petition's appeal was still pending before the Appellate Division. Several months later, we affirmed the denial of defendant's first PCR petition. State v. Worthy, No. A-2346-09 (App. Div. Mar. 30, 2011). Defendant refiled his second PCR petition.

The PCR court denied defendant's second petition because it was time-barred pursuant to Rule 3:22-12(a)(2). On appeal, we denied the second petition on the merits. State v. Worthy, No. A-1136-11 (App. Div. May 28, 2013). The

4

New Jersey Supreme Court denied defendant's petition for certification. <u>State v. Worthy</u>, 217 N.J. 52 (2014).

Defendant next filed a Writ of Habeas Corpus, seeking relief in the Federal courts. The United States District Court denied his petition and declined to issue a certificate of appealability. <u>Worthy v. Nogan</u>, No. 14-3056-BRM, 2016 WL 5403090, at *11 (D.N.J. Sept. 27, 2016). The Third Circuit thereafter also denied defendant's application for a certificate of appealability. <u>Worthy v. N.J. Dep't of Corr.</u>, No. 16-3951, 2017 WL 5197396, at *1 (3d Cir. Feb. 13, 2017).

In 2017, defendant filed a motion for a new trial alleging the State committed a <u>Brady</u> violation by failing to disclose the results of the muzzle-to-garment examination of Roy's clothing. That motion was filed, heard, and decided before defendant received the report memorializing the test results. The court denied defendant's motion in part because it was speculative as to the exculpatory nature of the forensic evidence since the results were not known. After defendant obtained the test results pursuant to an OPRA request, he renewed his motion for a new trial. The court denied defendant's second <u>Brady</u> motion, incorporating reasons set forth in its written opinion denying the first motion and supplementing that initial opinion with additional findings set forth

in the order denying the second <u>Brady</u> motion.  We now address defendant's appeal from the denial of the second motion.

II.

We have previously recounted in detail the circumstances of the murder in our opinion affirming defendant's conviction on direct appeal.  We presume the parties are familiar with that opinion.  For purposes of the present appeal, therefore, we need only briefly summarize the circumstances surrounding the murder.  In doing so, we draw from the court's factual findings as presented in its initial written opinion and the ensuing order denying defendant's second motion for a new trial.

As explained by the court, the evidence adduced by the State at trial showed that three days before the murder, codefendant Maples confronted the victim, Roy, and accused him of trying to run Maples over with a car in Philadelphia.  Maples threatened to kill Roy and his two brothers, Hakim and Halim, if Maples found out that Roy had tried to kill him.

Later that evening, Roy and Halim met with Maples, defendant, and Renato Santos.  They travelled together in a van headed to Yonkers, New York. At one point they stopped for a comfort break.  Before they all got back into the van, defendant pointed a gun at Roy's face while Santos pointed a gun at Halim.

6

Halim pleaded for their lives and Maples spared them.  Defendant and Santos both stated they were prepared to kill Halim and Roy.

Three days later, Maples and defendant discussed their belief that Roy tried to have Maples killed in Philadelphia.  Later that day, defendant, Ernesto Barber, James Irwin, and Steven Bennet drove to an apartment complex in Toms River.  Defendant went into an apartment and returned to the car with a gun inside a sock.  They dropped Bennet off in Jackson and proceeded to an apartment complex in Lakewood where the murder would soon take place.

Bennet rendezvoused with the others at the Lakewood apartment complex. Maples then arrived at the apartment complex in a Jeep.  Roy was in the front passenger seat of the Jeep.  Santos was seated in the rear.  Defendant entered the Jeep and sat behind Roy.  Maples, meanwhile, exited the Jeep and sat in defendant's car.

Santos got out of the rear seat of the Jeep and walked to the front passenger door, blocking the door, and preventing Roy from leaving.  Shots were fired at Roy, who managed to flee from the Jeep via the driver's side door.  However, Santos chased him down while shooting at him.  After Roy fell, Santos stood over him and fired once more.

7

Santos threw a gun and gloves into the woods. Irwin and Barber drove the Jeep to Jackson, where they crashed it into a tree and attempted to "torch" it.

III.

Defendant, appearing pro se, presents the following contention for our consideration:

> TRIAL COURT'S DECISION DENYING DEFENDANT'S MOTION FOR A NEW TRIAL DUE TO THE FACT THAT THE PROVISIONS SET FORTH IN [RULE 3:20]. ALSO, THE DEFENDANT STATES HIS DUE PROCESS RIGHTS TO HAVE A FAIR TRIAL WERE VIOLATED WHEN THE PROSECUTION WITHHELD EXCULPATORY EVIDENCE FROM THE DEFENSE, THE DEFENDANT'S 5TH, 6TH AND 14TH AMENDMENT RIGHTS OF THE UNITED STATES CONSTITUTION WERE VIOLATED AND THIS INJUSTICE SHOULD BE REVERSED.

IV.

We begin our analysis by acknowledging the legal principles governing this appeal. To advance the truth-seeking function of our criminal justice system, our court rules afford defendants broad pretrial discovery rights. State v. Scoles, 214 N.J. 236, 251–52 (2013). The rules entitle an accused person to automatic discovery of all evidence that the State has gathered to support its charges. Id. at 252 (citing R. 3:13-3). In particular, Rule 3:13-3(b)(1)(C)

8

expressly requires the State to make available the "results of reports of . . . scientific tests or experiments made in connection with the matter or copies thereof, which are within the possession, custody or control of the prosecutor."

The rule also explicitly requires the State to provide a defendant with access to all "exculpatory information or material." R. 3:13-3(a)(2), (b)(1). Indeed, as a matter of due process, the State must disclose to a defendant any evidence that is material and favorable to his or her defense. Brady, 373 U.S. at 87. Thus, a Brady violation results from the State's suppression of evidence favorable to an accused person that is material to the issue of his or her guilt or innocence, irrespective of the good faith or bad faith of the prosecution. Ibid. The Brady rule applies even when the defendant makes no formal request for Brady material. State v. Martini, 160 N.J. 248, 268 (1999) (citations omitted).

There are three essential elements to a Brady claim: "(1) the evidence at issue must be favorable to the accused, either as exculpatory or impeachment evidence; (2) the State must have suppressed the evidence, either purposely or inadvertently; and (3) the evidence must be material to the defendant's case." State v. Brown, 236 N.J. 497, 518 (2019); accord Moore v. Illinois, 408 U.S. 786, 794–95 (1972).

With respect to the third element, which is a critical point of contention in this appeal, "[e]vidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" State v. Hyppolite, 236 N.J. 154, 165 (2018) (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). This standard does not require the defendant to demonstrate "by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Kyles v. Whitley, 514 U.S. 419, 434 (1995). Rather, in determining whether a Brady violation has occurred, reviewing courts must inquire "whether in the absence of the undisclosed evidence the defendant received a fair trial, 'understood as a trial resulting in a verdict worthy of confidence.'" State v. Nelson, 155 N.J. 487, 500 (1998) (quoting Kyles, 514 U.S. at 434). Furthermore, in deciding whether evidence is material, we examine "[t]he significance of a nondisclosure in the context of the entire record." State v. Marshall, 123 N.J. 1, 200 (1991).

We note further that in reviewing a Brady claim, "the issue of whether evidence is material . . . [is] a 'mixed question of law and fact.'" State v. Robertson, 438 N.J. Super. 47, 64 (App. Div. 2014) (quoting State v. Marshall, 148 N.J. 89, 185 (1997)); accord United States v. Pelullo, 14 F.3d 881, 886 (3d

Cir. 1994). Consequently, we review a trial court's determinations of law de novo but will not disturb a court's factual findings unless they are "clearly erroneous." Marshall, 148 N.J. at 185 (citing Pelullo, 14 F.3d at 886).

We proceed to apply the foregoing legal principles and standards to the particular circumstances of this case. Ultimately, while we are satisfied that defendant has established the State suppressed favorable evidence in failing to divulge the report of the muzzle-to-garment test, we conclude defendant has not proven the report is material evidence in light of the strong evidence presented by the State showing defendant was a co-conspirator and accomplice in the killing of Roy.

A.

We begin our analysis by addressing the first element of the Brady rule, that is, whether defendant has shown that the muzzle-to-garment evidence "is favorable to [his] defense." Martini, 160 N.J. at 268 (citing Moore, 408 U.S. at 794–95). The forensic examination of Roy's clothing yielded the presence of gunshot residue that did not form a pattern. The report interpreted these results as "indicative of a firearm having been fired within the maximum muzzle-to-garment distance at which such residues would have been deposited."

We do not have the benefit of expert trial testimony interpreting the practical significance of the muzzle-to-garment test results of Roy's clothing. The record before us does not include testimony, for example, as to the maximum distance at which the seized firearms might deposit gunpowder residue. For purposes of addressing defendant's contention on appeal, we accept his argument that the forensic test results suggest that the distance between the muzzle and victim was greater than the distance between a person sitting in the front passenger seat of a truck and a shooter who either shot from within the vehicle or from just outside the vehicle.

The fact-sensitive legal issue is whether that forensic evidence is "favorable to the defense," not because it is intrinsically exculpatory, but rather because it impeaches other evidence that was presented by the State. See Bagley, 473 U.S. at 676 (explaining that impeachment evidence falls within the Brady rule because it "is 'evidence favorable to an accused'" (quoting Brady, 373 U.S. at 87)); accord State v. Russo, 333 N.J. Super. 119, 134 (App. Div. 2000) ("Exculpatory evidence includes not only material that is directly exculpatory of a defendant, but also evidence that may impeach the credibility of a State witness." (citations omitted)). Defendant contends he could have utilized the test results to discredit the State's theory that Roy was shot at close

range within a motor vehicle.[3] More specifically, defendant asserts that the muzzle-to-garment test results would have provided evidence with which to impeach Ernesto Barber, who was a key witness for the prosecution.

The trial court carefully reviewed the trial record, as have we, and found the muzzle-to-garment test could not have been used to impeach Barber because Barber never explicitly testified that defendant shot Roy at close range. We accept the trial court's findings with respect to the exact language Barber used in his testimony. We must note, however, that the trial court made factual findings based on the trial evidence that appear to be in tension with the muzzle-to-garment test results. Specifically, the court in its written opinion found:

> Santos then got out of the Jeep, and went to the passenger side door, where Roy was seated, with a gun in hand. Roy attempted to get out of the vehicle, but Santos was preventing him from opening the door. Santos opened the passenger side door, leaned inside, pointed the gun at Roy, and fired several shots.

The court's recitation of the facts adduced by the State at trial suggests that Santos was very close to Roy at the moment the initial shots were fired. To

---

[3] The court acknowledged the jury heard conflicting testimony from Barber as to the exact circumstances of the shooting. We note in this regard that other evidence was admitted at trial that suggests that shots may not have been fired into the vehicle. Testimony from the State's ballistics expert, for example, established that neither bullet holes, blood, nor anything of evidential value were found in the Jeep.

the extent that the muzzle-to-garment test results appear to be inconsistent with that version of the fatal encounter, we choose to treat those test results as being favorable to the defense for purposes of the <u>Brady</u> rule.

## B.

We next address the second element of the <u>Brady</u> rule, that is, whether the State intentionally or inadvertently suppressed the muzzle-to-garment test results. It is not disputed that the State Police report of the forensic analysis of the victim's clothing was not turned over to defendant until roughly fourteen years after it was prepared, and then, only pursuant to defendant's OPRA request. The prosecutor contends that the material was not "suppressed" by the State but offers no legal or factual reasons to support that conclusion. Because it is undisputed defendant did not receive the test results before trial, we conclude the State effectively suppressed it for purposes of the <u>Brady</u> rule.

## C.

We turn finally to the third element of the <u>Brady</u> rule. Our conclusion that the forensic test results might have been favorable to the defense does not mean that the outcome of the trial would have been different had that evidence been admitted. <u>See</u> <u>Hyppolite</u>, 236 N.J. at 165 (reiterating that the suppression of favorable evidence only constitutes a <u>Brady</u> violation when the evidence is also

material (citing Brady, 373 U.S. at 87)). The bar for establishing the favorability of an item of evidence is far lower than the bar for establishing materiality of that same evidence. See N.J.R.E. 401 ("'Relevant evidence' means evidence having a tendency in reason to prove or disprove any fact of consequence . . . ."); State v. Buckley, 216 N.J. 249, 261 (2013) ("Evidence need not be dispositive or even strongly probative in order to clear the relevancy bar."). In this case, defendant would have been permitted to introduce the muzzle-to-garment report and argue to the jury that it calls into question testimonial evidence presented by the State. That does not mean this forensic evidence would necessarily have had a reasonable probability of changing the outcome of defendant's trial.

Recently, our Supreme Court reaffirmed that "[t]he significance of the nondisclosure 'depends primarily on the importance of the [evidence] and the strength of the State's case against [a] defendant as a whole.'" Brown, 236 N.J. at 520 (alterations in original) (quoting Marshall, 123 N.J. at 200). In other words, in determining the probable impact the undisclosed evidence would have had on the verdict, we consider the evidential value of the suppressed material in relation to the State's trial proofs.

In this instance, the muzzle-to-garment test results are not particularly important since the State's case did not depend on whether the victim was shot

at point-blank range or at a somewhat greater distance. Nor did the State's case depend on whether Roy was inside the Jeep when shots were first fired at him.

Furthermore, the distance between a gun muzzle and the victim was not a critical circumstance in proving defendant's role in the premeditated murder.[4] The State presented evidence that defendant just a few days earlier had held a gun to the victim's head. The State also presented evidence that defendant retrieved a gun from an apartment and brought it to the scene of the homicide. The State thus presented strong proof that defendant actively participated in the retaliatory execution as a coconspirator and accomplice if not as an actual shooter. See N.J.S.A. 2C:2-6(b)(4) ("A person is legally accountable for the conduct of another when [he or she] is engaged in a conspiracy with such other person.").

In sum, we conclude, as did the trial court, that defendant has failed to establish that it is reasonably probable that timely disclosure of the muzzle-to-garment test results would have led to a different trial outcome. We base this

---

[4] Defendant contends the muzzle-to-garment test results are material because he could have prepared a more effective defense using the test results, resulting in the jury finding defendant guilty of manslaughter instead of murder. We reject that contention as implausible. The State's evidence shows this was an orchestrated shooting in retaliation for actions that occurred days earlier. The distance between the shooter and victim has no bearing on whether the planned homicide constitutes murder or manslaughter.

conclusion on our assessment that the nondisclosed forensic report was not an important piece of evidence in the context of the State's strong proofs establishing defendant's active participation in the murder scheme as a coconspirator and accomplice. We further hold that notwithstanding the absence of the undisclosed test results, considering all of the evidence that was introduced, "defendant received a fair trial, 'understood as a trial resulting in a verdict worthy of confidence.'" Brown, 236 N.J. at 520 (quoting Nelson, 155 N.J. at 500). Accordingly, defendant's motion for a new trial based on a Brady violation was properly denied.

To the extent we have not already addressed them, any other arguments raised by defendant lack sufficient merit to warrant discussion in this written opinion. Rule 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1113-18T2