# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0806-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ASHLEY GARDENER,

     Defendant-Appellant.

_____

> Submitted May 20, 2024 – Decided August 5, 2024
>
> Before Judges Gilson, Berdote Byrne, and Bishop-Thompson.
>
> On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 18-04-0058.
>
> Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).
>
> Matthew J. Platkin, Attorney General, attorney for respondent (Mercedes Robertson, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Ashley Gardener of first-degree human trafficking, N.J.S.A. 2C:13-8(a)(3) and N.J.S.A. 2C:2-6; first-degree promotion of organized street crime, N.J.S.A. 2C:34-1(b)(3), N.J.S.A. 2C:33-30, and N.J.S.A. 2C:2-6; and other crimes related to her conduct in forcing B.H. (Barbara), a then-seventeen-year-old girl, to engage in prostitution.[1] Defendant was sentenced to consecutive terms of twenty-five years in prison for the convictions of human trafficking and promotion of organized street crime, resulting in an aggregate prison term of fifty years, with twenty years of parole ineligibility.

Defendant appeals arguing that the trial court erred in (1) allowing the State to conduct a second trial after a mistrial; (2) barring her from using evidence that Barbara had been charged with unrelated crimes prior to the start of the second trial; (3) refusing to instruct the jury on alleged affirmative defenses that defendant herself had been a victim of human trafficking; and (4) running her sentences for human trafficking and promotion of organized street crime consecutively. We reject defendant's first three arguments because they are not supported by the record or the governing law. So, we affirm defendant's

---

[1] To protect the confidentiality of the victim, we use initials and a pseudonym. See R. 1:38-3(c)(12).

convictions. We reverse the sentences and remand for a resentencing so that the sentencing court can correct the sentences that will run consecutively.

I.

We discern the facts from the record, focusing on the evidence presented at trial.

In January 2018, Barbara reported that she had been held against her will and compelled by defendant to engage in prostitution on numerous occasions. Following an investigation, a grand jury indicted defendant for seven crimes: first-degree conspiracy, N.J.S.A. 2C:5-2; first-degree human trafficking, N.J.S.A. 2C:13-8(a)(3) and N.J.S.A. 2C:2-6; second-degree facilitating human trafficking, N.J.S.A. 2C:13-8, N.J.S.A. 2C:13-9(a)(1), and N.J.S.A. 2C:2-6; first-degree promoting prostitution, N.J.S.A. 2C:34-1(b)(3) and N.J.S.A. 2C:2-6; first-degree promotion of organized street crime, N.J.S.A. 2C:34-1(b)(3), N.J.S.A. 2C:33-30, and N.J.S.A. 2C:2-6; first-degree advertising commercial sexual abuse of a minor, N.J.S.A. 2C:13-10(b)(1); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(b)(5)(a)(i).

In that same indictment, co-defendant Breon Mickens was charged with four crimes, including first-degree conspiracy and first-degree human

3

trafficking. Mickens pled guilty to conspiracy and agreed to testify against defendant.

A jury was originally selected on June 18, 19, and 20, 2019. Before opening statements, the State learned of the identification of Jerry Brown, who was allegedly one of the men who had paid for sex with Barbara. A detective then video-recorded an interview of Brown on July 8, 2019.

The next day, opening statements were made in the trial. The following day, on July 10, 2019, as the trial continued, the State notified defendant and the trial court that the detective had located and interviewed Brown. Shortly thereafter, the State provided copies of the video-recorded interview of Brown. Defendant immediately moved for a mistrial and to dismiss all the charges against her with prejudice. Defendant argued that the State had violated the rule laid down in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), by failing to inform the defense about the interview of Brown in a timely manner. In support of that position, defendant argued that some of Brown's statements were exculpatory.

The trial court conducted a Rule 104 evidentiary hearing outside the presence of the jury. At that hearing, the detective testified concerning how he located and interviewed Brown. In that regard, he explained that on July 1,

A-0806-21

2019, he had been asked to interview Brown and that he had conducted the interview on July 8, 2019.

Based on the detective's testimony, the court found that the State had directed the detective to interview Brown before trial began, but it had failed to inform the defense of Brown's existence and that he might be a potential witness until July 10, 2019, after the jury heard opening statements and some testimony from witnesses. The trial court also found that Brown's statements were potentially favorable to the defense because Brown had stated that defendant had not been involved in his dealings with Barbara. The trial court then found that defendant had been prejudiced by the State's action because her counsel might have presented a different opening statement and might have engaged in different cross-examination tactics had counsel known of Brown. Ultimately, the trial court held that the State violated the Brady rule and that the appropriate remedy was a mistrial followed by a new trial. In making that ruling, the court rejected defendant's argument that dismissal of the charges with prejudice was warranted because the court found that there was no evidence that the State intentionally "goad[ed] the defendant into moving for a mistrial." Defendant filed a motion for leave to appeal the trial court's decision not to dismiss the indictment with prejudice, but we denied that motion.

5

A second trial was conducted in September and October 2019. The State called twelve witnesses, including Barbara and Brown. The State also presented numerous exhibits, including text messages, photographs, and videos.

Barbara testified that she met defendant in 2017, when Barbara was seventeen years old. Defendant was then twenty-nine years old. According to Barbara, defendant asked her if she "wanted to make money" and promised to pay her if she worked as a prostitute. When Barbara agreed, defendant took her to her bedroom, gave her revealing clothing to wear, and took photographs of her in provocative poses.

The State presented evidence that defendant used the photographs to make advertisements offering sex with Barbara in exchange for money. In that regard, the State called a New Jersey State Police detective who testified that ads were posted on a website called BackPage.com (BackPage). The detective explained that the website was used to sell and solicit sex. The State also presented copies of the ads, which referred to Barbara as "Mottie the Redhead Hottie" and stated that Barbara was available to "book for adult exclusives." The ads included phone numbers that the State linked to defendant. The detective had subpoenaed the website and obtained ads of both Barbara and defendant. Invoices revealed the same user account uploaded and paid for all those ads and that the ads used

6

the same phone numbers.  The detective also explained that ads featuring Barbara were posted on December 24, 2017, and January 9, 2018.

In her testimony at trial, Barbara explained that she had never seen the ads and had not disseminated them.  She also testified that defendant had come up with the nickname "Mottie the Redhead Hottie."

Barbara testified that from late December 2017 to early January 2018, defendant took her to various hotels, including a Courtyard, a Red Roof Inn, and an Element, where defendant "had [Barbara] selling [her] body."  Barbara explained that defendant booked the rooms, and Mickens, whom she referred to as defendant's "baby dad," drove the two of them to the hotels.  Barbara also testified that defendant had promised her money for her work as a prostitute but never gave her any.

Barbara testified that on December 28, 2017, she left the Courtyard hotel in Ewing, taking money that she felt was rightfully hers.  Thereafter, she contacted her parents to pick her up.  Barbara went on to explain that on January 9, 2018, she had accepted Mickens' offer to drive her to her boyfriend's house. Mickens instead took her to Trenton to meet defendant, and defendant then beat her up on the side of the road.  Barbara recounted that defendant threatened to harm her on multiple occasions if she tried to stop working as a prostitute for

7

A-0806-21

defendant's financial gain. She also detailed how defendant had hit her and thrown her cell phone out a window.

Barbara testified that from January 9 through January 11, 2018, defendant took her to the Red Roof Inn in Lawrence Township and forced her to have sex with numerous men. She explained that defendant made the appointments with the men. She also testified that defendant would then tell her what services to perform and how long to perform the services. Defendant also told Barbara to lie to the men about her age and if a client asked about her age, to tell them that she was nineteen or twenty years old instead of seventeen years old.

During her testimony, Barbara explained that although she knew defendant had been a prostitute in the past, she never saw defendant sell her own body while she was forcing Barbara to be a prostitute. In that regard, she explained that when men arrived at the hotel rooms, defendant was usually present to collect the payment. When Barbara collected the payment, she would give the money to defendant. When asked if she and defendant were "just sharing a hotel room," Barbara testified: "No, we [were] not." Barbara explained that she did not want to have sex with any of the men who came to the hotels, but that defendant "told [her] if [she] didn't make [defendant] money, [defendant] was going to hurt [her]."

 A-0806-21

Finally, Barbara testified that she escaped the Red Roof Inn on the night of January 11, 2018. She explained that she began walking along the shoulder of I-295.

The State called several witnesses who corroborated various parts of Barbara's testimony. One of those witnesses was an inspector with the Department of Transportation, who had been working an evening shift on January 11, 2018. The inspector explained that he had been sitting in his service vehicle around 9:00 p.m. when he saw Barbara walking southbound on I-295 before crossing six lanes to approach his driver's side window and ask him for help. The inspector then called the police.

Approximately twenty minutes later, a state trooper arrived and spoke to Barbara. Barbara informed the trooper that she was seventeen years old and had been held at a nearby hotel. Barbara was then taken to a police station where she gave a more detailed report about how she had been forced to perform sexual acts with various men. She named defendant and Mickens and explained that one of the rooms she had been held in was number 273 at the Red Roof Inn.

In the early hours of January 12, 2018, several detectives went to the Red Roof Inn and learned that defendant and Mickens were staying in room 273 and that they had also recently stayed in room 271. The detectives then went to room

273, and when defendant answered the door, a detective arrested her. At the time of her arrest, defendant was holding a purple LG cell phone, which was seized. The police later learned that the phone number associated with that phone was listed on the ads on BackPage.

A search of the phone recovered data, including text messages and pictures. Those text messages were presented to the jury and showed that defendant had engaged in negotiations with various men seeking sex with Barbara.

A search of room 273 also revealed gift cards, debit cards, credit cards, and a second cell phone. The number associated with the second cell phone was also listed on the BackPage ads.

Surveillance footage from the Red Roof Inn showed that on January 9, 2018, Barbara, defendant, Mickens, and another man arrived late in the evening and went to room 271. The surveillance also showed that after midnight on January 10 and through the morning of January 11, 2018, nine men came in and went to the area near rooms 271 and 273. There was also surveillance video of Barbara leaving room 273 at 8:53 p.m. on January 11, 2018, carrying a backpack.

10

A-0806-21

The jury was also shown messages from a Facebook account bearing the name "Jihadah Mohammed" with a photo of defendant (the Jihadah Facebook account). The State presented evidence that law enforcement personnel had linked the account to defendant based on the photograph, statements from Barbara that the account belonged to defendant, and registration records subpoenaed from Facebook indicating that the numbers of the cell phones taken from defendant were also associated with the account.

The State then presented various messages from the Jihadah Facebook account. Those messages showed that defendant had sent out photographs of Barbara and that the photographs were the same as those used in the BackPage ads. In some of the Facebook messages, defendant stated that she was prostituting Barbara to make money. In a conversation on January 10, 2018, defendant sent a photograph of Barbara to another user, stating that she was "making a killing off her ass." Defendant also wrote that she was "a pimp" and had "that bitch [performing sexual acts] right now as we speak."

Defendant also told Facebook users that she had hurt Barbara, saying she "beat her ass just enough so she can work," and "beat the shit out of the white bitch." On December 28, 2017, the date of Barbara's attempted escape, defendant, through the Jihadah Facebook account, messaged Barbara's Facebook

11

account and said: "You [would] be about the most idiot ass bitch if you ran off with my bread." Defendant went on to tell Barbara: "You're dead."

On January 10, 2018, defendant sent a Facebook message that appeared to corroborate Barbara's account of her violent recapture. Defendant messaged someone that she had "snatch[ed] [Barbara] right out [of] my man['s] car and durfed her, lol," and that she had then "[t]old that bitch[] [to] get up and get my money." That same day, when someone sent defendant a message asking her if Barbara was "black and blue from last night," defendant responded: "She made me [$1,400] already, lol."

During her defense, defendant did not dispute that Barbara had engaged in prostitution. Instead, she argued that both she and Barbara were prostitutes and had worked together out of the same hotel rooms. In support of that theory, defense counsel highlighted for the jury times when videos from the Red Roof Inn showed Barbara outside in the parking lot and her laughing and conversing with a man outside the door of room 271.

After all the evidence had been presented, a charge conference was held. Defendant requested that the jury be instructed that she was contending she was a victim of human trafficking as affirmative defenses to the charges of human trafficking and promoting prostitution. The trial court rejected that request,

reasoning that there was no evidence presented to support those defenses and, if given, those defenses would require the jury to speculate.

After considering all the evidence presented, the jury found defendant guilty of all charges except for first-degree advertising commercial sexual abuse of a minor. Thereafter, defendant moved for a new trial, but the trial court denied that motion.

Defendant was sentenced on March 4, 2021. The sentencing court merged the conspiracy conviction with the human trafficking conviction. On the human trafficking conviction, the court sentenced defendant to twenty-five years in prison, with twenty years of parole ineligibility. On the conviction of first-degree promotion of organized street crime, the court granted the State's motion for an extended term and sentenced defendant to twenty-five years in prison to run consecutively to the sentence for human trafficking. On the conviction of second-degree facilitating human trafficking, defendant was sentenced to eight years in prison. On the conviction of first-degree promoting prostitution, defendant was sentenced to fifteen years in prison. On the conviction of second-degree endangering the welfare of a child, defendant was sentenced to eight years in prison. Those three sentences were all run concurrent to the sentence for human trafficking. Defendant was also sentenced to registrations under

13

Megan's Law. N.J.S.A. 2C:7-1 to -23, and parole supervision for life. So, in aggregate, defendant was sentenced to fifty years in prison, with twenty years of parole ineligibility.

Defendant now appeals from her convictions and sentences.

II.

On appeal, defendant presents the following four arguments for our consideration:

> POINT I – THE CONVICTIONS SHOULD BE REVERSED BECAUSE DEFENDANT WAS IMPROPERLY PRECLUDED FROM CROSS-EXAMINING BARBARA ON HER CRIMINAL CHARGES—MOST OF WHICH WERE FILED AFTER DEFENDANT'S ARREST AND SOME OF WHICH WERE RESOLVED THREE DAYS BEFORE SHE WAS SCHEDULED TO TESTIFY AGAINST DEFENDANT—AND WHICH WOULD HAVE REVEALED HER INTEREST IN CURRYING FAVOR WITH THE STATE.

> POINT II – DEFENDANT WAS DENIED HER RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY THE TRIAL COURT'S REFUSAL TO CHARGE THE JURY ON THE STATUTORY AFFIRMATIVE DEFENSES TO HUMAN TRAFFICKING AND PROMOTING PROSTITUTION.

> POINT III – THE SECOND PROSECUTION SHOUD HAVE BEEN BARRED FOLLOWING THE MISTRIAL BECAUSE THE STATE INTENTIONALLY SUPPRESSED EXCULPATORY MATERIAL.

14

POINT IV – THE MATTER MUST BE REMANDED FOR RESENTENCING BECAUSE THE SENTENCING COURT MISTAKENLY BELIEVED THAT IT WAS STATUTORILY REQUIRED TO RUN THE SENTENCE FOR PROMOTING ORGANIZED STREET CRIME CONSECUTIVE TO THE SENTENCE FOR HUMAN TRAFFICKING, RESULTING IN A FIFTY-YEAR SENTENCE.

A.   The Mistrial Followed by a Second Trial.

In her third argument, defendant contends that the trial court erred by not dismissing all the charges against her with prejudice after it granted her motion for a mistrial.  She asserts that the State violated the rule set forth in Brady by failing to disclose the interview of Brown until after the trial began and that the State's conduct was "so outrageous" that the double jeopardy clauses of both the United States and New Jersey Constitutions should have barred a second trial.

In Brady, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where [it] is material either to guilt or to punishment, irrespective of the good faith or bad faith of the [State]."  373 U.S. at 87.  That rule has been expanded and applies even if a defendant did not specifically request the exculpatory evidence.  United States v. Bagley, 473 U.S. 667, 681-82 (1985); see also State v. Martini, 160 N.J. 248, 268 (1999).  To establish a Brady violation, the defense must demonstrate: (1) the prosecutor failed to disclose the

evidence; (2) the evidence was of a favorable character to the defendant; and (3) the evidence was material. Moore v. Illinois, 408 U.S. 786, 794-95 (1972); State v. Brown, 236 N.J. 497, 518 (2019).

In this case, the trial court found that all three Brady prongs had been met. Defendant, for obvious reasons, does not challenge that finding, and we discern no basis for reviewing that issue. Nevertheless, we do note that was sufficient evidence to support the trial court's finding concerning a Brady violation. Accordingly, we turn our focus to the question of whether the trial court erred in denying defendant's motion to dismiss the indictment with prejudice.

Appellate courts review a trial court's decision concerning the dismissal of an indictment for an abuse of discretion. State v. Saavedra, 222 N.J. 39, 55 (2015). We will only disturb a trial court's decision if the trial court "clearly abused" its discretion. Id. at 55-56 (quoting State v. Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994)).

The principle of double jeopardy under both the United States and New Jersey Constitutions ensures that no person will be placed in jeopardy "more than once for the same offense." State v. Allah, 170 N.J. 269, 278-79 (2002) (quoting United States v. Wilson, 420 U.S. 332, 340 (1975)). "In a jury trial, jeopardy attaches after the jury is impaneled and sworn." Id. at 279.

16

Accordingly, once the trial begins, the defendant "is generally entitled to . . . be free from the harassment of successive prosecutions." State v. Lynch, 79 N.J. 327, 340-41 (1979). In other words, the State "should not be allowed to make repeated attempts to convict an individual." State v. Torres, 328 N.J. Super. 77, 85 (App. Div. 2000).

Nevertheless, termination of a trial after jeopardy attaches does not always prohibit a second trial. Allah, 170 N.J. at 280. If a mistrial is declared "at the behest of the defendant," and the defendant is the one who has "elected to terminate the proceedings," the government is ordinarily permitted to pursue a second trial. Oregon v. Kennedy, 456 U.S. 667, 672-73 (1982); see also State v. Wolak, 33 N.J. 399, 401 (1960) (explaining that an assertion of double jeopardy "will not prevail where the jury was discharged on [a] defendant's motion").

In determining whether to permit a retrial, the focus is on whether the error that caused the mistrial was intended by the State "to provoke a mistrial or [was] 'motivated by bad faith or undertaken to harass or prejudice' the defendant." Kennedy, 456 U.S. at 670 (quoting United States v. Dinitz, 424 U.S. 600, 611 (1976)). Accordingly, "in the context of a Brady violation, the remedy of dismissal of an indictment with prejudice is utilized when 'the conduct

A-0806-21

of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" Brown, 236 N.J. at 528 (quoting United States v. Russell, 411 U.S. 423, 431-32 (1973)). In other words, the bar attaches "[o]nly where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial." Kennedy, 456 U.S. at 676; see also Brown, 236 N.J. at 527-28 (quoting and applying the rule laid down in Kennedy).

We discern no abuse of discretion in the trial court's decision to permit a second trial of defendant. There is no evidence in the record that the prosecutor intended to provoke a mistrial by failing to disclose information about Brown in a timelier fashion. While the State could have been more diligent in locating and interviewing Brown, he was first interviewed on July 8, 2019. It was only at that point that the State learned that Brown might support defendant's contention that she had not controlled Barbara or forced her into prostitution. Moreover, the record establishes that Brown testified at the second trial and that defendant used his testimony to support her contention. In other words, there is no evidence that defendant was prejudiced by the delay in the State's disclosure of Brown as a potential witness.

B.     The Other Criminal Charges Against Barbara.

After Barbara presented her direct testimony, defense counsel informed the trial court and the prosecutors that she intended to cross-examine Barbara on various unrelated criminal offenses that had recently been resolved in municipal court. The prosecution objected, and the trial court ruled that those offenses, none of which were criminal convictions, could not be used to cross-examine Barbara.

Defendant argues that the trial court erred by preventing her from using the charges to challenge Barbara's credibility. In that regard, defendant contends that her Sixth Amendment right to confront Barbara was violated because Barbara may have had a motive to cooperate with the State to receive favorable treatment in her separate criminal matters. In making that argument, defendant points out that Barbara was the State's "central witness," and that Barbara's credibility was critical to proving the charges against defendant.

Appellate courts review a trial court's evidentiary rulings for an abuse of discretion. State v. Jackson, 243 N.J. 52, 64 (2020). A trial court is given "[c]onsiderable latitude . . . in determining whether to admit evidence." State v. Feaster, 156 N.J. 1, 82 (1998). Nevertheless, appellate courts give no deference to a trial court's legal conclusions. Jackson, 243 N.J. at 65.

A-0806-21

Under N.J.R.E. 609(a)(1), evidence of a witness's conviction of a crime generally "shall be admitted" for the purpose of attacking the witness's credibility. Nevertheless, admission of a criminal conviction is still subject to N.J.R.E. 403, and evidence of a conviction can be excluded if the probative value is outweighed by the prejudicial effect. State v. Balthrop, 92 N.J. 542, 544-45 (1983).

N.J.R.E. 609 does not include convictions of disorderly persons offenses, which under the criminal code are "not crimes within the meaning of the Constitution of this State." State v. Harris, 209 N.J. 431, 446 (2012) (Long, J., dissenting) (emphasis omitted) (quoting N.J.S.A. 2C:1-4(b)(1)) (explaining that disorderly persons convictions are not admissible under N.J.R.E. 609).

Even when convictions are not admissible under N.J.R.E. 609, however, a witness's credibility may also be attacked "by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives." Davis v. Alaska, 415 U.S. 308, 316 (1974). The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee a defendant's right to confront witnesses, including through cross-examination of "a witness's motivation in testifying." Jackson, 243 N.J. at 65.

All that said, a defendant does not have "a license to roam at will under the guise of impeaching the witness." State v. Pontery, 19 N.J. 457, 473 (1955). A trial court "may bar inquiry into a witness's potential bias, without offending the Confrontation Clause, because of concerns about 'harassment, prejudice, confusion of the issues, the [witness's] safety, or interrogation that is repetitive or only marginally relevant.'" State v. Bass, 224 N.J. 285, 303 (2016) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). So, "the competing interest proffered" by the State "to limit a defendant's confrontation right must 'be closely examined.'" Jackson, 243 N.J. at 66 (quoting State v. Budis, 125 N.J. 519, 532 (1991)). Accordingly, the trial court must determine "'whether the circumstances fairly support an inference of bias' or whether the proposed examination raises any concerns." Ibid. (quoting Bass, 224 N.J. at 303).

A defendant has the "right to explore evidence tending to show that the State may have a 'hold' of some kind over a witness, the mere existence of which might prompt the individual to color his [or her] testimony in favor of the prosecution." State v. Parsons, 341 N.J. Super. 448, 458 (App. Div. 2001) (quoting State v. Holmes, 290 N.J. Super. 302, 312 (App. Div. 1996)). A claim of potential bias "is particularly compelling when the witness is under

A-0806-21

investigation, or charges are pending against the witness," at the time that the witness's testimony is proffered against the defendant. <u>Bass</u>, 224 N.J. at 303.

Moreover, criminal charges against a prosecution witness need not be related to the current charges against the defendant to be admissible for impeachment purposes. <u>Id.</u> at 304. The relevant inquiry is whether the charges may "give rise to a motive to cooperate" with the State. <u>Id.</u> at 305. Furthermore, "[i]n a given case, a charge against a witness that has been resolved by dismissal or sentencing before the witness testifies" may also be "an appropriate subject for cross-examination." <u>Id.</u> at 304. So, a trial court must "undertake a careful evaluation" of a claim of bias based on a witness's criminal charges in which "[t]he nature of the witness's alleged offense, and the sentencing exposure that he or she confronts by virtue of that offense," are "significant factor[s]." <u>Id.</u> at 305.

After defendant's arrest and indictment, Barbara was criminally charged in three unrelated matters. On November 30, 2018, Barbara was charged with theft by unlawful taking and credit card theft. Those charges were later downgraded to disorderly persons offenses, and Barbara pled guilty to those offenses in municipal court in July 2019. Second, on April 19, 2019, Barbara was charged with third-degree possession of a knife for an unlawful purpose and

22

fourth-degree aggravated assault. Those charges were downgraded to disorderly persons offenses of simple assault and harassment in August 2019, and Barbara pled guilty in municipal court on September 23, 2019. Third, on June 22, 2019, Barbara was charged with third-degree possession of a controlled dangerous substance. That charge was downgraded to a disorderly persons offense of failure to make a lawful disposition to police, and Barbara pled guilty to the offense on September 23, 2019. Accordingly, by the time that Barbara was finished with her direct testimony, all the charges against her had been resolved with disorderly persons convictions.

The trial court ruled that only criminal convictions could be introduced to impeach Barbara's credibility under N.J.R.E. 609. The trial court also found that there was no evidence that Barbara had cut any deal with the State to resolve her charges. In that regard, the court found that allowing the cross-examination on the charges would be too "tenuous." Accordingly, the court precluded cross-examination on the charges. Instead, the court ruled that defense counsel could ask Barbara if the State had made her any promises or given her anything in exchange for her testimony.

23

We hold there was no error under N.J.R.E. 609. The trial court correctly reasoned that a disorderly persons conviction was not a criminal conviction for purposes of N.J.R.E. 609. See Harris, 209 N.J. at 446 (Long, J., dissenting).

We also discern no abuse of discretion in the trial court's decision to preclude defense counsel from cross-examining Barbara on the unrelated charges. There is no indication that the State had a deal with Barbara concerning her other charges. The case against defendant was handled by the State's Division of Criminal Justice, which is part of the Attorney General's Office. In contrast, Barbara's criminal charges were handled by the Burlington County Prosecutor's Office and, after they were downgraded, they were handled by a municipal prosecutor. Additionally, Barbara was initially charged with third- and fourth-degree crimes, which were not at a level to indicate that Barbara would have had an incentive to assist the prosecution to resolve those charges.

Moreover, even if the trial court's limitation on defendant's cross-examination of Barbara had been an error, we must also decide whether the error was "harmless beyond a reasonable doubt." Bass, 224 N.J. at 307 (quoting Van Arsdall, 475 U.S. at 684). In that regard, courts "will disregard '[a]ny error or omission [by the trial court] . . . unless it is of such a nature as to have been clearly capable of producing an unjust result.'" Id. at 308 (alterations and

omission in original) (quoting State v. Castagna, 187 N.J. 293, 312 (2006)). "The possibility that the error led to an unjust result 'must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached.'" Ibid. (alteration in original) (quoting State v. Lazo, 209 N.J. 9, 26 (2012)).

The evidence at defendant's trial does not support a conclusion that precluding cross-examination of Barbara on the unrelated criminal offenses led to an unjust result. While Barbara was the State's key witness, her testimony was corroborated by other witnesses and evidence, including defendant's text messages and Facebook records. In short, the evidence against defendant was overwhelming and compelling, and it is hard to conceive that a jury would have disregarded that evidence even if Barbara had been cross-examined about her unrelated criminal offenses.

C.     The Failure to Give Jury Instructions on Defendant's Affirmative Defenses that She Was a Victim of Human Trafficking.

"[A]ppropriate jury instructions are essential for a fair trial." State v. Ball, 268 N.J. Super. 72, 112 (App. Div. 1993). "A trial court must charge the jury on an affirmative defense if there is a rational basis in the evidence for the charge." Bass, 224 N.J. at 320. In deciding whether the rational basis test has been met, a trial court "must view the evidence in the light most favorable to the

defendant." State v. A.L.A., 251 N.J. 580, 595 (2022). The defendant has "the burden to produce some evidence in support of" an affirmative defense. State v. Walker, 203 N.J. 73, 87 (2010). If there is "some" evidence, "whether produced in the State's case or in [the] defendant's case, the instruction on the affirmative defense . . . should be given to the jury." Id. at 89.

At the charge conference, defense counsel requested affirmative defense charges for both the human trafficking offense and the promoting prostitution offense. Under the human trafficking statute, N.J.S.A. 2C:13-8(c), "[i]t is an affirmative defense to prosecution for a violation of this section that, during the time of the alleged commission of the offense of human trafficking[,] . . . the defendant was a victim of human trafficking." Likewise, under the promoting prostitution statute, N.J.S.A. 2C:34-1(e), "[i]t is an affirmative defense to prosecution for a violation of this section that, during the time of the alleged commission of the offense, the defendant was a victim of human trafficking . . . or compelled by another to engage in sexual activity, regardless of the defendant's age."

In arguing for the affirmative defenses, defendant pointed to Barbara's testimony that Mickens was "the muscle man," that he would drive defendant and Barbara to the hotels where they met the men who wanted sex, and that

26

Mickens also sold them drugs. Defendant also pointed to the BackPage ads for defendant's sexual services. So, defense counsel contended that the jury could infer that Mickens was prostituting both defendant and Barbara.

The trial court found that while there was some evidence to support that defendant had been a prostitute at some prior time, there was no evidence she was trafficked by Mickens or another other person while Barbara had been prostituted. Moreover, the court found that the evidence at trial showed that Mickens provided rides to defendant and Barbara when defendant requested those rides.

We discern no reversible error in the trial court's decision not to charge the jury with the affirmative defenses. Both Barbara and Mickens testified that he drove defendant and Barbara to hotels at defendant's request and was paid by defendant for that service. While Mickens may have also sold drugs to defendant and Barbara, that was not evidence that he was forcing defendant into prostitution. Barbara consistently testified that Mickens was not involved with actually setting up or carrying out any sexual services. Indeed, Mickens stayed outside the hotel while defendant negotiated with Barbara's clients.

The text messages and Facebook messages admitted into evidence also showed that defendant was prostituting Barbara and not herself. In those

27

messages, defendant bragged about prostituting Barbara and taking the money for Barbara's prostitution. She described herself as a "professional" and a "business woman," and her messages implied that to the extent that she had been involved in prostitution, she had done so voluntarily. In short, we agree with the trial court that giving the affirmative defense instructions would have been asking the jury to speculate because there was not sufficient evidence to satisfy the rational basis standard.

D.    The Sentences.

In her final argument, defendant contends that the sentencing court erred in directing that her sentence for the promotion of organized street crime run consecutively to her sentence for human trafficking. This issue requires an analysis of both the indictment that charged defendant with the promotion of organized street crime and the underlying crime the jury found defendant committed to be guilty of the promotion of organized street crime. Ultimately, the issue involves an interpretation of the sentencing provisions of the statute governing the crime of promotion of organized street crime.

N.J.S.A. 2C:33-30(a) provides that a person "promotes organized street crime" if that individual "conspires with others as an organizer, supervisor, financier[,] or manager to commit any crime specified in chapters 11 through

18, 20, 33, 35, or 37 of Title 2C of the New Jersey Statutes; N.J.S.A. 2C:34-1; N.J.S.A. 2C:39-3; N.J.S.A. 2C:39-4; [N.J.S.A. 2C:39-4.1]; N.J.S.A. 2C:39-5; or N.J.S.A. 2C:39-9." (Citations reformatted). Accordingly, both promoting prostitution under N.J.S.A. 2C:34-1(b)(3), and human trafficking under N.J.S.A. 2C:13-8(a)(3), are underlying offenses that can constitute the crime of promotion of organized street crime.

N.J.S.A. 2C:33-30(b) states that for grading purposes, promotion of organized street crime "is a crime of one degree higher than the most serious underlying crime referred to in subsection a." If, however, the "most serious underlying crime" is a crime of the first-degree, then promotion of organized street crime "is a first[-]degree crime" that carries a sentencing exposure of between fifteen and thirty years, rather than the typical ten-to-twenty-year range for a first-degree crime under N.J.S.A. 2C:43-6(a)(1). N.J.S.A. 2C:33-30(b). The grading provision goes on to state that a sentence imposed for promotion of organized street crime "shall be ordered to be served consecutively to the sentence imposed upon conviction of any underlying offense referred to in subsection a." Ibid.

The question of statutory interpretation presented on this appeal is whether the grading provision for the promotion of organized street crime would

apply to a crime that was not included in the indictment that charged defendant with the promotion of organized street crime. We hold that the grading provision for the promotion of organized street crime can only be applied to an underlying crime that a defendant was charged with and convicted of promoting.

In this case, in count five, defendant was indicted based on the allegation that she "did conspire with others as an organizer, supervisor, financier[,] or manager to promote prostitution, in violation of N.J.S.A. 2C:34-1(b)(3), contrary to the provisions of N.J.S.A. 2C:33-30, N.J.S.A. 2C:2-6, and against the peace of this State, the government and dignity of the same." (Citations reformatted). In other words, the State indicted defendant for the promotion of organized street crime based on the underlying offense of promoting prostitution.

Moreover, in convicting defendant of the promotion of organized street crime, the jury was asked to consider only the underlying offense of promoting prostitution. The verdict sheet asked the jury whether defendant "did conspire with others as an organizer, supervisor, financier, or manager to promote prostitution" in considering the charge of the promotion of organized street crime.

The jury separately found that defendant committed the crime of human trafficking. The jury did not, however, find that human trafficking was the underlying offense giving rise to the conviction of promotion of organized street crime.

At sentencing, the State argued that because defendant had been convicted of human trafficking and because human trafficking was one of the underlying offenses for promotion of organized street crime, the court was required to run the sentence for the promotion of organized street conviction consecutively to the sentence for the human trafficking conviction. The court agreed and accordingly ran the sentence for the conviction of promotion of organized street crime consecutively to the sentence for the conviction of human trafficking. That was a legal error.

Consistent with the plain language of the statutes, we hold that a defendant can be sentenced based only on the underlying crime that the jury found was committed in finding that a defendant promoted organized street crime. In short, here, defendant was indicted for and convicted of the promotion of organized street crime based on the underlying crime of promoting prostitution. Defendant was neither charged with nor convicted of promotion of organized street crime based on human trafficking. While the jury separately found that defendant was

31

guilty of human trafficking, human trafficking was not a crime that could have been used for grading defendant's promotion of organized street crime conviction. Instead, the sentencing court was required to run defendant's sentence for the promotion of organized street crime consecutively to the sentence for her conviction of promoting prostitution.

Here, on the conviction of human trafficking, defendant was sentenced to twenty-five years in prison, with twenty years of parole ineligibility. Defendant has not challenged that sentence, and the sentence was lawful. See N.J.S.A. 2C:13-8(d) (providing that a sentence for human trafficking shall be either a term of twenty years without parole or a specific term between twenty years and life imprisonment, of which the defendant must serve twenty years before being eligible for parole). On the conviction of promotion of organized street crime, defendant was sentenced to twenty-five years in prison. That sentence was also lawful because under N.J.S.A. 2C:33-30(b), a sentence for promotion of organized street crime shall be between fifteen and thirty years.

On the conviction of promoting prostitution, defendant was sentenced to fifteen years, and that sentence was lawful because it was within the statutory range for a first-degree offense. See N.J.S.A. 2C:43-6(a)(1) (explaining that the

sentencing range for a first-degree offense shall be between ten and twenty years).

The only error in sentencing defendant was running the sentence for the conviction of promotion of organized street crime consecutively to the sentence for the conviction of human trafficking. We, therefore, vacate the sentence and remand for resentencing. On remand, the court is to run the sentence for the promotion of organized street crime consecutively to the sentence for promoting prostitution. So, defendant's aggregate sentence will be forty years in prison, with twenty years of parole ineligibility.

Defendant's convictions are affirmed. The sentences are vacated, and we remand for a resentencing consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-0806-21