**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2994-22

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

BRANDON K. MOSBY,

      Defendant-Appellant.

_____

Submitted December 9, 2024 – Decided July 2, 2025

Before Judges Berdote Byrne and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 15-03-0789.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Steven M. Gilson, Designated Counsel, on the brief).

Grace C. MacAulay, Camden County Prosecutor, attorney for respondent (Jason Magid, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant, Brandon Mosby, appeals from an order denying his petition for post-conviction relief ("PCR") without an evidentiary hearing, arguing he established a prima facie case of ineffective assistance of counsel due to his trial attorney's failure to discuss passion/provocation manslaughter and/or self-defense with him. As such, he claims he should have been afforded an evidentiary hearing. He also argues the PCR court erred in denying him a new trial because the State committed a Brady[1] violation and violated his right to confront an expert witness with impeachment evidence. We disagree and affirm the trial court's order denying the PCR and an evidentiary hearing as we agree defendant has failed to present a viable prima facie case of ineffective assistance of counsel.

I.

Testimony at trial established the following factual record. Jewel Williams was dating defendant between June 2013 and March 2014. On March 4, 2014, Williams and defendant spent the day arguing via text messages, ending in Williams ultimately sending a text message breaking up with defendant. Later that evening, Williams and her three-year-old son were in their rented room at

---

[1] Brady v. Maryland, 373 U.S. 83 (1963).

A-2994-22

502 White Horse Pike in Audubon. The decedent, John Carey, was renting another room at 502 White Horse Pike.

When Williams arrived home, Carey was watching a movie on the couch in the living room. Williams told him "not to let anyone in" because she "didn't feel like being bothered." She then went upstairs with her son to her room, got into bed, and turned off the lights.

Five to ten minutes later, defendant entered the room wearing all black. Although defendant would frequently spend the night in Williams room while the two were dating, defendant did not live there and did not have a key. While Williams was lying in bed with her son, defendant began hitting her in the head. Defendant told Williams "he was done," and he had come to retrieve some personal items.

Williams was concerned about her son's well-being and did not want him involved in the situation; while defendant was removing his belongings from a dresser drawer, she left the room and went downstairs. Defendant followed Williams downstairs, where they continued to argue. Carey was still downstairs on the couch watching television. Defendant was leaving the house when, as he was closing the door, Williams declared, "you'll never see us again." The statement caused defendant to turn around and re-enter the house.

 A-2994-22

Once back inside the house, defendant began hitting Williams with his fists. The fight propelled Williams over an arm of the couch with defendant lying on top of her and pulling her hair. During the fight, Williams' three-year old son started to come down the stairs. Carey noticed the child was downstairs and intervened to break up the fight between defendant and Williams. He told them to "stop fighting because the baby was down the steps." Defendant responded to Carey by asking him if he "want[ed] to wear this ass whooping?" Williams testified defendant then swung at Carey and they began to fight. However, Williams had previously told police Carey had initiated the contact between him and the defendant by grabbing him in a bear hug.

As defendant and Carey were fighting, Williams grabbed her son and ran out of the house in such a rush that neither were wearing shoes or a jacket. As she was running out, Williams heard a "loud slam" causing her to turn around and see Carey fall to the ground with his head by the first step of the outside door.

A cab driver defendant had hired and instructed to wait, testified he saw defendant exit the house, but then go right back inside. When the door was open, the cab driver heard an argument emanating from inside the home and left without collecting his fare.

Williams ran out into the middle of the street and was almost struck by another car, causing the car to stop. When the car stopped, Williams forced herself and her son into the passenger side of the car and squeezed herself underneath the passenger, telling both the driver and passenger, "[P]ull off. [P]ull off. He has a gun." Williams testified she had never seen defendant with a gun but wanted to scare the women so they would drive away from the house.

As the car was pulling away, defendant approached the passenger side of the car and told Williams not to leave. He came up from behind the car, screaming "wait," and reached into the car. When defendant approached the car, Williams screamed, "you got to go, you got to go, that's him." Williams testified she was the one who hit the gas pedal to leave, but the driver stated she was the one who pulled away from the location.

Williams arrived back at the house approximately forty minutes later. Carey was still lying face down on the doorstep, in the same spot and position Williams had last seen him in after the loud slam. Williams' call to 9-1-1 was played for the jury.

When police arrived, they found Carey face down in the doorway. The police turned him over and observed an injury to his abdomen and blood around his shirt and on the floor. The medical examiner determined Carey died from a

contact gunshot wound to the abdomen. Six to ten feet away from Carey's body was a black Carhartt hooded jacket. The police collected the jacket along with other items from the scene. The jacket contained a government-issued document containing defendant's name and date of birth, and a Blistex tube.

The jacket and its contents, including the Blistex tube, were sent to the New Jersey State Police DNA lab for testing. Testing of the cuff and neck of the jacket revealed defendant was the source of the major DNA profile on the jacket. Testing from inside of the Blistex tube also matched defendant's DNA profile.

Williams was brought to the police station to make a statement. The officers then asked her to call defendant. The recorded phone call was played for the jury. During the phone call, defendant asked Williams multiple times if she had his jacket and stated he needed her to get it.

Based on this evidence, defendant was indicted on March 25, 2015, on seven counts. He was charged with first degree murder, N.J.S.A. 2C:11-3(a)(1), (2) (count one); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count two); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count three); certain persons not to have weapons, N.J.S.A. 2C:39-7(b)(1) (count seven); and three drug offenses. The trial court

6

severed counts one, two, three, and seven from the three drug offenses to be tried separately.

During the trial taking place between September 19, 2017, and October 4, 2017, Williams provided testimony that conflicted with her police interview. During direct examination, Williams testified defendant made first contact when he "swung" at Carey. However, during cross-examination she admitted she told detectives Carey "was the first one to move and the first one to grab" defendant. She described the interaction as a "back-and-forth" like a bear hug. She also affirmed "that's when those two started tussling after . . . Carey grabbed" defendant. Regarding weapons, she testified each time she spoke to the police, she was asked if she had seen a gun, or seen defendant shoot Carey, or if defendant had ever threatened her with a gun that night, and she always responded "no." She further testified she repeatedly told police she never heard a gunshot that night.

Former Detective Sergeant Salvator DiPaola, of the Camden County Ballistics Unit, was accepted as an expert in firearms and tool mark identification. He testified he examined the bullet specimens or fragments and identified one of the bullet fragments as "[a] 38 caliber class discharged metal

jacket of an expanding type bullet," a bullet with "the sole purpose of . . . caus[ing] a massive wound channel to cause severe bleeding."

During summations, the State explained "[t]he jury charge will tell you that the use of the gun alone is enough for you to show purpose, that the purpose was . . . to kill him." It then argued the location of the gunshot wound to the abdomen "with a weapon that had a bullet that was intended to cause maximum bleeding -- we heard that from Salvator DiPaola; right? . . . That in and of itself shows you the defendant was aware that there was . . . a practical certainty of death, okay?"

The State also argued the jury could infer defendant intended to kill Carey, specifically arguing if defendant was

> trying to get away from the big bad John Carey, right, who's just trying to get you out of the house, what do you do when you're at the doorway? You don't take out a gun. You don't put the gun to his abdomen. You don't shoot him. I'm already out of the house. I'm scot-free. I'm going to turn around and run; right?
> If the defendant's purpose wasn't to kill John Carey, look at his body, look at where the door is. The defendant's already pretty much at the outside of the house with the door open. He's scot-free. He just gets to leave. This shows you that the defendant's purpose was to shoot and kill John Carey, because John Carey got involved in a fight that he had no business getting involved in, according to the defendant; right? I'm beating her. It's none of your business. Do you want a piece of this ass whooping too?

8

The jury was instructed to consider charges of first-degree murder, passion/provocation manslaughter, aggravated manslaughter, and reckless manslaughter. Defendant was found guilty on all counts and convicted of first-degree murder, second-degree unlawful possession of a weapon, second-degree possession of weapon for an unlawful purpose, and second-degree certain persons not to have weapons.

The court then sentenced defendant to fifty years for first-degree murder, subject to the No Early Release Act ("NERA"),[2] a concurrent eight-year prison term for unlawful possession of a weapon, with a four-year period of parole ineligibility under the Graves Act,[3] and a consecutive eight-year prison term for certain persons not to have a weapon, with a four-year period of parole ineligibility under the Graves Act.[4]

Defendant filed a direct appeal of his conviction and sentence, alleging (1) the trial court erred in admitting evidence defendant had assaulted his ex-girlfriend before the victim was shot; (2) the court erred in ruling if defendant

---

[2] N.J.S.A. 2C:43-7.2.

[3] N.J.S.A. 2C:43-6.

[4] Count two, possession of weapon for an unlawful purpose, was merged with count one.

A-2994-22

offered testimony that the victim possessed drug paraphernalia and was waiting for a drug delivery on the night of the shooting, the State would be able to present evidence that defendant possessed drugs at the same time; (3) the prosecutor prejudiced defendant when she mischaracterized the DNA expert's testimony in summation; and (4) defendant's fifty-eight year sentence was manifestly excessive. We affirmed defendant's convictions and sentence on July 23, 2020, see State v. Mosby, No. A-3514-17 (App. Div. July 23, 2020) (slip opinion at 14-29), and the Supreme Court denied his petition for certification, State v. Mosby, 244 N.J. 383 (2020).

On September 14, 2020, the State sent defendant's counsel a letter notifying them of "[p]otential Brady [m]aterial." She stated DiPaola had "substantiated allegations from 2003 of [i]nappropriate [a]ctions [t]owards [a]nother [m]ember and [h]arassment, during his prior law enforcement service with the New Jersey State Police." Further, the "State Police Office of Professional Standards ("OPS") substantiated those allegations in connection with the adjudication of Equal Employment Opportunity ("EEO") complaints filed against former Trooper DiPaola. The complaints specifically address comments former Trooper DiPaola made which may implicate race, gender, and ethnicity." The letter concluded with a notice that counsel could obtain a copy

of the investigative file, but the record does not show defendant ever requested the file.

Defendant then petitioned for PCR, arguing his trial counsel (1) was ineffective for failing to object during summations; (2) trial counsel failed to move for a new trial, pursuant to R. 2: 10-1, when the verdict was against the weight of the evidence; (3) the State committed a Brady violation by failing to disclose impeachment evidence regarding its ballistics expert; and (4) defendant's trial counsel failed to pursue the possible defenses of self-defense and passion/provocation due to lack of consultation with defendant. Defendant was ultimately denied post-conviction relief after the court allowed for additional briefing and argument regarding self-defense. Regarding the State's failure to disclose exculpatory evidence, the PCR court noted the State conceded to the first two elements of a Brady violation as articulated in State v. Brown, 236 N.J. 497, 518 (2019), and as such those elements were met. However, it held, in the context of the entire trial record, it was "not reasonably probable that timely disclosure . . . would have changed the trial's outcome." In support of its decision, the court made the following findings:

> Unlike Giglio v. United States, 405 U.S. 150 (1972), in which the withheld evidence was relevant to the credibility of the sole witness linking the defendant to the crime . . . and promises that the witness would

escape criminal charges in exchange for testifying against the defendant, here, Mr. Dipaola was not a crucial witness for the State. The evidence of the EEO investigation is relevant to the witness's credibility because the State's request for the bullet analysis did indicate . . . the races of both the Defendant and the victim.

However, that another ballistics expert came to an identical result after retesting the evidence allays concerns that Mr. Dipaola's conclusions were inaccurate because . . . of any potential bias. Here, I don't even have before me what the EEO substantiation of conduct was, whether it was a substantiation of an alleged racial discriminatory conduct, gender, sexual preference, religion, something else. But even assuming in the light most favorable to the [d]efendant here that it was, in fact, based on race . . . I'm going to operate under that premise in my decision.

Furthermore, although the State mentioned the expanding bullet in support of intent during closing, other evidence also supported intent, such as that the [d]efendant was outside and could have extricated himself from the altercation, that a deadly weapon was used, and the nature of the wound as a contact wound.

Regarding trial counsel's alleged failure to explore other defenses, the court addressed passion/provocation and self-defense separately. The court found counsel's performance was not deficient because counsel was "thoroughly knowledgeable as to the facts of the case and the law." Also, counsel strategically decided not to discuss passion/provocation with the jury other than mentioning the lesser-included offenses during summations. It noted "[a]

12

review of the record makes it clear trial counsel did not merely forget to discuss the lesser included charges with the jury summation." Rather, counsel "made a strategic decision not to go into a detailed analysis of passion provocation, either because she did not want to confuse the jury, [or] because she wanted to go all in on an argument that without a weapon, the State failed to meet their ultimate burden, and reasonable doubt remained."

It additionally found, even if trial counsel's decision had been deficient, "there [was] no evidence to suggest that a discussion of passion provocation would have changed the outcome." Based on the record, defense counsel established on cross-examination Williams had told detectives Carey had initiated the physical altercation, which was not challenged by the State on redirect. Instead of arguing "the lesser included offense of passion provocation during summation, defense counsel used Ms. Williams' conflicting statements to argue that she was not credible as a witness." The PCR court found counsel's decision to attack Williams' "credibility was a trial strategy as part of her all or nothing approach to create reasonable doubt."

Afterwards, the court heard oral argument regarding the discrete issue of self-defense. The court noted defendant's claim that trial counsel did not discuss the defense with him was a self-serving statement.

13

The PCR court ultimately denied his petition for post-conviction relief on this issue without holding an evidentiary hearing, finding defendant had failed to demonstrate his defense was prejudiced. The court concluded he did not show a reasonable jury would have found he satisfied the elements of self-defense. Regardless of defendant's affidavit, defendant did not proffer "any additional evidence that contradicts the testimony elicited at trial or would have otherwise made [] [the] potential defense a viable strategy."

On or about December 16, 2020, defendant filed a petition for PCR. The PCR court denied all claims without an evidentiary hearing.

On appeal defendant claims:

POINT I:
THIS MATTER MUST BE REMANDED FOR AN EVIDENTIARY HEARING BECAUSE DEFENDANT ESTABLISHED A PRIMA FACIE CASE OF TRIAL COUNSEL'S INEFFECTIVENESS FOR FAILING TO PURSUE PASSION/PROVOCATION MANSLAUGHTER AND/OR SELF-DEFENSE DUE TO A LACK OF CONSULTATION WITH DEFENDANT.

In his pro se supplemental submission, defendant raises this additional argument:

POINT I:
THE PCR COURT ERRED BY FAILING TO GRANT THE PETITIONER A NEW TRIAL BASED ON THE STATE'S FAILURE TO DISCLOSE EXCULPATORY EVIDENCE WHICH VIOLATED BRADY V. MARYLAND & THE

14

PETITIONER'S RIGHT TO CONFRONTATION UNDER THE U.S. CONST. AMENDS. IV, XIV; N.J. CONST. ART. I PAR. 9, 10.

## II.

A trial court's decision to deny a PCR petition without an evidentiary hearing is reviewed de novo. See State v. Jackson, 454 N.J. Super. 284, 291 (App. Div. 2018). To establish a claim of ineffective assistance of counsel, a defendant must satisfy the two-prong test from Strickland v. Washington, 466 U.S. 668 (1984): (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) "the deficient performance prejudiced the defense." 466 U.S. at 687; see also State v. Fritz, 105 N.J. 42, 58 (1987) (adopting the Strickland two-prong test in New Jersey).

With respect to prong one, a defendant must establish that "counsel's representation fell below an objective standard of reasonableness." An attorney's performance will not be deemed deficient if counsel acted "'within the range of competence demanded of attorneys in criminal cases'" as the Constitution requires only "reasonably effective assistance." Id. at 687 (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)). Therefore, "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the

15

defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-88.

Pursuant to prong two, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. This requires defendant show his "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. It is insufficient for defendant to show the errors "had some conceivable effect on the outcome of the proceeding." Id. at 693. Ultimately, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if [it] had no effect on the judgment." Id. at 691. As the PCR court aptly noted, defendant's claim for relief was in part based on his unsupported claim that he was not consulted, later memorialized in his affidavit.

And, it is well established, if unable to obtain immediate relief, a defendant may claim an evidentiary hearing is warranted to develop the factual record in connection with the PCR claim. See State v. Preciose, 129 N.J. 451, 462 (1992). However, the PCR court should grant an evidentiary hearing only where: (1) a defendant is able to prove "a prima facie case in support of [PCR]," (2) "there are material issues of disputed fact" that must be resolved with

evidence outside of the record, and (3) the "hearing is necessary to resolve the claims for relief." R. 3:22-10(b); see also Preciose, 129 N.J. at 462; State v. Porter, 216 N.J. 343, 354 (2013); State v. Rose, 458 N.J. Super. 610, 624 (App. Div. 2019). A defendant is not entitled to PCR relief based on bald assertions or self-serving statements. See Porter, 216 N.J. at 355.

He also contends the PCR court's "speculation in concluding that defendant had fired the fatal shot" was unfounded and "hardly precluded" defendant from asserting self-defense or passion/provocation manslaughter. As further support for his argument, he points out that there were no witnesses to "the fatal aftermath of the 'tussling,'" which calls into question whether it was Carey, and not the defendant, who had a gun. Further, he highlights that Williams testified "she never saw a gun, nor had defendant threatened her with a gun that night."

We disagree. Because no weapon was ever recovered, no one ever saw a weapon, no one witnessed the shooting, and there was a gap of approximately an hour between the time Williams heard the "loud slam" -- which she testified to consistently was not a gunshot -- upon leaving the home and her return, defendant's counsel argued there was reasonable doubt as to whether defendant was the shooter. In order to argue either passion/provocation or self-defense,

defense counsel would have had to concede defendant shot plaintiff, either in self defense or after being provoked into doing so – a significant element missing from the State's case. The decision to not admit defendant was the shooter was a strategic one – employed to create sufficient reasonable doubt as noted by the PCR court. A failed trial strategy does not equate to ineffective assistance of counsel. State v. Bey, 161 N.J. 233, 251 (1999) ("Merely because a trial strategy fails does not mean that counsel was ineffective."). Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action [by counsel] 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Further, the PCR court must not focus on the defendant's dissatisfaction with counsel's "exercise of judgment during the trial . . . . while ignoring the totality of counsel's performance in the context of the State's evidence of [the] defendant's guilt." State v. Castagna, 187 N.J. 293, 314 (2006).

The State presented evidence demonstrating defendant and Williams were in an argument in the living room where Carey was seated and defendant began hitting Williams. As Carey noticed Williams' son on the stairs, he intervened and told the couple to stop fighting. Defendant then asked Carey, "Do you want to wear this ass-whooping?" Although it is not clear who started the physical

18

altercation, Williams testified as she left the residence she saw Carey fall. When Williams returned to the residence, she testified Carey was in the same spot in the doorstep as when she left, face down, and appeared not to have moved. The State also established that after Williams ran from the residence, Carey and defendant were the only two people who remained at the home. It is undisputed Carey died of a close contact gunshot wound, not a blow to his head.

As the PCR court found, the record showed trial counsel was "thoroughly knowledgeable as to the facts of the case and the law." Counsel extensively cross-examined witnesses to undermine the State's case and raise reasonable doubt, such as Williams' conflicting accounts of who started the fight, the lack of any evidence showing defendant had a gun that night, and the lack of any eyewitnesses to the fatal shooting. Counsel's trial strategy to not further discuss the lesser included offenses was a decision to avoid confusing the jury on competing theories which would have required defendant to admit to having shot the victim, or to solely focus on undermining the State's burden, which falls within the range of reasonable professional assistance. Based on the record, defendant has failed to prove his counsel's performance was deficient.

As the PCR court found, the jury instruction included passion/provocation, regardless of who requested the charge. The jury had an

opportunity to review the lesser included charge and did not find passion/provocation manslaughter based on the evidence presented, including the evidence defendant now asserts supports passion/provocation manslaughter and self-defense.

Defendant also argues a new trial is warranted because the State committed a Brady violation by failing to disclose impeachment evidence of its expert witness, DiPaola, and precluded his right to impeach the witness' credibility.[5]  He contends DiPaola's testimony undermined his defense, which included passion/provocation manslaughter.  He asserts DiPaola's disciplinary proceedings involved racism, defendant is "African American," and the evidence was material.

The State maintains the evidence was not material because the State's case against defendant "was based on testimonial evidence of the prime witness," Williams, and it was not reasonably probable the disclosure would have altered the trial's outcome.  It contends because no weapon was recovered, the expert did not compare the recovered bullets against a weapon.  As a result, DiPaola's testimony was limited to shell casings and "did not prove that defendant was the shooter."  Further, a separate "ballistics expert" corroborated DiPaola's finding.

---

[5] Defendant raises this issue for the first time on appeal.

The State relies on the PCR court's findings that DiPaola was not a crucial witness, and although the State referred to his findings as evidence of intent, in summation the trial record contained ample other evidence to prove intent.

The State has a duty to provide a defendant with exculpatory evidence in its possession during discovery. State v. Marshall, 148 N.J. 89, 154 (1997); Brady, 373 U.S. at 87. To establish a Brady violation, a defendant must show: (1) the evidence is favorable to the defense, "either as exculpatory or impeachment evidence"; (2) the State suppressed the evidence, "either purposely or inadvertently;" and (3) the evidence is material. State v. Brown, 236 N.J. 497, 518 (2019) (citing State v. Nelson, 155 N.J. 487, 497 (1998)).

The State concedes the first two prongs of Brady, which leaves only the issue of materiality. Pursuant to the definition of materiality employed specifically in cases asserting a Brady violation, "[E]vidence is material if there is a 'reasonable probability' that timely production of the withheld evidence would have led to a different result at trial." Brown, 236 N.J. at 520 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)). "Reasonable probability" means "a probability sufficient to undermine confidence in the outcome." Nelson, 155 N.J. at 500 (quoting Bagley, 473 U.S. at 682).

A-2994-22

Materiality turns on "the importance of the [evidence] and the strength of the State's case against [the] defendant as a whole," Marshall, 123 N.J. at 200, in light of "the context of the entire record." Brown, 236 N.J. at 518-19 (quoting Marshall, 123 N.J. at 199-200). The context includes "the timing of disclosure of the withheld evidence, the relevance of the suppressed evidence, and the withheld evidence's admissibility." Id. at 519.

The facts in this case demonstrate DiPaola's testimony was not material to the outcome. The State's case did not singularly rely on DiPaola's testimony to establish intent. Rather, its case against defendant relied upon Williams' testimony. As the PCR court correctly held, the State also showed intent by arguing defendant "was outside and could have extricated himself from the altercation, that a deadly weapon was used, and the nature of the wound as a contact wound."

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2994-22